## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Select Comfort Corporation, | Court File No. 13-cv-02451-DWF-SER |
| Plaintiff, | |
| vs. | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S DAUBERT MOTION TO EXCLUDE REPORT AND OPINIONS OF EXPERT WITNESS DAVID STEWART** |
| Tempur Sealy International, Inc., d/b/a/ Tempur-Pedic | |
| And | |
| Mattress Firm, Inc., d/b/a Mattress Firm, | |
| Defendants. | |

## INTRODUCTION

Plaintiff Select Comfort Corporation ("Select Comfort") moves to exclude certain opinions asserted in the expert report of David Stewart ("Stewart"), the purported marketing expert witness of Defendants Tempur Sealy International, Inc. ("Tempur-Pedic") and Mattress Firm, Inc. ("Mattress Firm") (collectively, "Defendants").

First, Stewart's legal opinions regarding the lawful nature of Defendants' advertising must be excluded because he is not qualified to testify to the ultimate issue of false advertising and because legal questions are not the proper scope of an expert's testimony. Similarly, Stewart's opinion regarding the admissibility of another expert's report, based on the legal requirements set forth in the Manual for Complex Litigation, are improper.

Second, certain of Stewart's opinions lack a sufficient basis and must be excluded for failing to adhere to the Daubert admissibility requirements.  These opinions include his unsupported and speculative conclusions regarding evidence obtained through secret shoppers, the incentives of retail salespersons, the impact of negative information available on the internet, and the way in which to measure the impact of the false statements at issue in this case.

Lastly, the entirety of Section A of Stewart's expert report should be excluded because the opinions stated therein do not constitute proper rebuttal despite being submitted as part of a rebuttal report.  Judge Rau recently ordered that Section A of Stewart's report was timely to the extent it rebuts Select Comfort's expert reports but that admissibility is within Judge Frank's purview.[1]  (*See* Dkt. No. 249 at 3.)  Notably, Stewart admitted that Section A of his report was <u>not</u> meant to rebut Select Comfort's expert witnesses, and indeed, it contains affirmative opinions, not rebuttal opinions.

## FACTUAL BACKGROUND

I.   **DEFENDANTS' PERVASIVE AND NATIONWIDE DISSEMINATION OF FALSE AND DECEPTIVE ADVERTISING.**

Mattress Firm salespersons nationwide have consistently and pervasively disseminated numerous false oral statements about Select Comfort, including that Sleep Number beds get mold and that Mattress Firm chose to stop selling Sleep Number due to quality issues.  (*See* Patton Aff. Ex 57 at Ans. Interrog. 3 Attachment A.)  Mattress Firm

---

[1]   Judge Rau specifically declined to assess the detail of Stewart's report on Select Comfort's motion to strike and indicated that that assessment is properly reserved for this motion.  (Dkt. No. 249 at 7 ("[T]he level of analysis Select Comfort seeks is more properly within the discretion of Judge Frank.").)

salespersons have also disseminated false statements through the use of two flyers.  The first was developed and disseminated by Mattress Firm and contains false statements related to Select Comfort's warranty, durability, reliability, and satisfaction.  (*See id.*; Am. Compl. Ex. D.)  The second was developed by Tempur-Pedic and disseminated by its retailers, such as Mattress Firm.  (*See* Patton Aff. Ex. 55 at Ans. Interrog. 17; Am. Compl. Ex. C; Patton Aff. Ex 57 at Ans. Interrog. 3 Attachment A.)

Tempur-Pedic developed that flyer—which it dubbed the "kill slide" containing "the most impactful" and "most important" statements to consumers—when it launched a bed competitive to Select Comfort's memory foam beds in 2013.  (*See* Patton Aff. Ex. 2 (Campbell Dep. 84:13–87:24, 103:6–10, 214:14–215:2).)  As depicted below, that flyer contains numerous comparisons between Tempur-Pedic's Tempur-Choice bed and Select Comfort's Sleep Number m-series beds:



**LOOKING FOR THE LATEST AND GREATEST IN PERSONALIZED SUPPORT?**

| **NEW! TEMPUR-Choice COLLECTION** | | **SLEEP NUMBER® M-SERIES** | |
|---|---|---|---|
| TEMPUR-Adapt TECHNOLOGY | Proprietary TEMPUR® Materials ☐ | ☐ Commodity Memory Foam | |
| | Multiple Zones Per Sleeper ☐ Dedicated Lumbar Support ☐ Virtually Eliminates Hammocking ☐ | ☐ One Zone Per Sleeper | |
| | 2 Never-Lost, Stand-Up Remotes ☐ | ☐ Wireless Remotes (one with m7, two with m9) | |
| | Over 100 Comfort Settings Per Sleeper ☐ | ☐ 20 Comfort Settings Per Sleeper | |
| 25 YEAR LIMITED WARRANTY | 25-Year Limited Warranty ☐ | ☐ 20-Year Limited Warranty | LIMITED WARRANTY 20 YEARS |

**✓ THE CHOICE IS CLEAR!**

(*See* Am. Compl. Ex. C.)

The false claims on the kill slide were incorporated into training materials delivered through webinars (Patton Aff. Ex. 42, 44; Ex. 41 at 8313), through Tempur's e-learning portal (Patton Aff. Ex. 8 (O'Donnell Dep. 27:1–28:9); Ex. 36; Ex. 40 at 6513, 6538), materials presented at national sales events (Patton Aff. Ex. 35 at 2209, 2210, 2211, 2220; Ex. 3 (Cascone Dep. 40:9–41:18 (testifying that Patton Aff. Ex. 35 was presented at National Sales Meeting attended by all Tempur Sealy reps)), and through materials used for in-person training at retailers across the country (Patton Aff. Ex. 40; Ex. 37 at 3825, 3830; Ex. 3 (Cascone Dep. 98:15–99:24 (testifying that Patton Aff. Ex.

40 is a presentation used on his "road show" training sessions and "Comfort U" training sessions throughout 2013); Ex. 8 (O'Donnell Dep. 15:5–16:22, 19:25–26:25).)

## II.   THE PARTIES' EXPERT REPORTS RELATED TO MARKETING.

On March 6, 2015, Select Comfort disclosed Hal Poret as its consumer survey expert.  Poret opined as to the meaning and materiality of a number of statements made by Defendants both orally and on the kill slide.  (Patton Aff. Ex. 23 (Poret Report at 5).)  Also on March 6, 2015, Select Comfort disclosed Dr. Erich Joachimsthaler as its branding expert.  Joachimsthaler opined that Defendants' conduct negatively impacted Select Comfort's brand.  (Patton Aff. Ex. 17 (Joachimsthaler Report at 29).)

On April 17, 2015, Defendants disclosed Stewart as a purported marketing expert. Stewart's report contains three sections, two of which critique the opinions and analysis of Poret and Joachimsthaler.  (*See* Patton Aff. Ex. 27 (Stewart Report).)  In a separate section, Stewart opined on specific issues related to the advertising at issue in this litigation.  (*Compare id.* Sections B–C, *with* Section A.)

### DAUBERT STANDARD

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; **(b)** the testimony is based on sufficient facts or data; **(c)** the testimony is the product of reliable principles and methods; and **(d)** the expert has reliably applied the principles and methods to the facts of the case.

The district court's role is that of a gatekeeper that must screen "expert testimony for relevance and reliability." *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (citing *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 591–93 (1993)).   The proponent of the evidence has the burden of establishing, by a preponderance of the evidence, that testimony is admissible under Rule 702.   *Id.*

"To satisfy the relevance requirement, the proponent must show that the expert's reasoning or methodology was applied properly to the facts at issue." *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010).   To establish reliability, the proponent must show both that the "'expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid.'" *Id.* (quoting *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006)).   An expert's opinion should be excluded when it fails to consider all relevant facts, is not supported by sufficient facts, or is contrary to the facts in evidence. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000) ("If a party believes that an expert opinion has not considered all of the relevant facts, an objection to its admission is appropriate."); *see also, e.g., Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.").[2]

---

[2]   *Lawrey v. Good Samaritan Hosp.*, 751 F.3d 947, 953 (8th Cir. 2014) (finding district court did not abuse its discretion by excluding expert testimony that "simply did not fit the facts of the case"); *Kapps v. Biosense Webster, Inc.*, 813 F. Supp. 2d 1128, 1149 (D. Minn. 2011) (excluding opinion because there "is simply too great an

**ARGUMENT**

## I.   STEWART'S LEGAL CONCLUSIONS MUST BE EXCLUDED.

Experts cannot opine as to legal opinions or otherwise provide legal analysis in their expert reports. *See, e.g. Cattanach v. Burlington N. Santa Fe, LLC*, Civil No. 13-1664 (JRT/JSM), 2015 WL 5521751, at *9 (D. Minn. Sept. 18, 2015) ("'[E]xpert testimony on legal matters is not admissible' because '[m]atters of law are for the trial judge.'" (quoting *S. Pines Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003)); *Honeywell Int'l, Inc. v. ICM Controls Corp.*, 45 F. Supp. 3d 969, 1009–11 (D. Minn. 2014); *St. Jude Med., S.C., Inc. v. Biosense Webster, Inc.*, 994 F. Supp. 2d 1033, 1056 (D. Minn. 2014), *appeal filed* (8th Cir. Dec. 30, 2014).   As put by one court, the "rule prohibiting experts from providing their legal opinions or conclusions is so well-established that it is often deemed a basic premise or assumption of evidence law—a kind of axiomatic principle." *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (listing cases) (quotation omitted).

Hence, an expert may not opine on the ultimate legal issue of whether an advertisement is or is not false or misleading. *See e.g.*, *Gold v. Midland Credit Mgmt., Inc.*, 82 F. Supp. 3d 1064, 1068–69 (C.D. Cal. 2015) (striking portions of expert report stating that a collections letter and education brochure sent by a collections agency

---

analytical gap between [expert's] opinion and the underlying facts" (quotation omitted)); *Kemp v. Tyson Seafood Group, Inc.*, CIV. 5-96-173 JRT/RLE, 2000 WL 1062105 (D. Minn. July 19, 2000) (excluding opinion despite proffered expert's requisite expertise to proffer market-related opinion because the opinions offered in the case "are devoid of competent, factual predicates").

contained false or misleading statements); *Innovation Ventures, LLC v. NVE, Inc.*, 90 F. Supp. 3d 703, 723–24 (E.D. Mich. 2015) (holding that expert's statements suggesting that a notice sent out by a party was not misleading "[were] examples of the kind of testimony that crosses the line from proper opinion evidence to improper factual and legal conclusions," and precluding expert from making such statements at trial); *see also AstraZeneca LP v. Tap Pharm. Prods., Inc.*, 444 F. Supp. 2d 278, 293–94 (D. Del. 2006) (holding that expert could not offer opinion regarding a party's intent to mislead in an advertising campaign).

In his report, Stewart asserts a number of conclusions related to the legality of Defendants' advertising.  For example, he opines that it is <u>not</u> misleading "for a sales person to answer a direct question about why his or her firm does not carry a product, such as the Sleep Number bed, by referring to their own personal prior experience or to what they may have heard from others."  (Patton Aff. Ex. 27 (Stewart Report at 16).) This is a legal conclusion on the ultimate issue—Stewart is opining that a certain practice is not misleading as a matter of law under the Lanham Act.  Stewart cannot make such a conclusion, as the decision regarding whether Defendant's advertising is misleading or not is reserved for the jury.

Similarly, Stewart opines that the advertising statements at issue are entirely lawful for any number of reasons.  For example, Stewart opines that Defendants' conduct is permissible because it constitutes lawful comparative advertising and/or puffery. Specifically, he states, "Plaintiff's complaint conflates the common practices of comparative advertising and comparative selling, as well as puffery, with the use of

unambiguously false claims." (*Id.* at 15.)  Stewart even goes so far as to imply that the statements on the kill slide are lawful because they are "clearly comparative in nature." (*See id.*)  In addition, he opines that the distribution of the kill slide "does not constitute broad dissemination" (a Lanham Act element Select Comfort must prove).  (*Id.* at 8.) These are all legal conclusions in which Stewart is opining that Defendants' advertising is lawful under the Lanham Act for one reason or another.  But these defenses to Plaintiff's false advertising claim are for the jury to evaluate, not an expert witness.

Stewart's legal conclusions on the ultimate issue of false advertising must be excluded.

## II.   STEWART'S CONCLUSIONS REGARDING THE MANUAL FOR COMPLEX LITIGATION MUST BE EXCLUDED.

At multiple points throughout his report, Stewart broadly opines that Poret's survey "fails" to meet certain requirements in the Manual for Complex Litigation ("Manual").  (Patton Aff. Ex. 27 (Stewart Report at 21, 22, 23, 24, 26, 29, 30, 33).)  The requirements set forth in the Manual have been generally adopted as an admissibility standard applied by courts nationwide.  *See Bacardi & Co. Ltd. V. N.Y. Lighter Co.*, No. 97-CV-7140 JS VVP, 2000 WL 298915, at *4–5 (E.D.N.Y. Mar. 15, 2000) (explaining that a standard based on the requirements in the Manual for Complex Litigation "has been repeatedly used and cited by courts throughout the country").

However, because admissibility of expert evidence and testimony (e.g., survey results) is an issue for the court to decide, it is inappropriate for Stewart to opine on whether Poret's survey meets the requirements for the admissibility standard.  *See*

*Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F. Supp. 2d 1118, 1128 (D. Minn. 2003) ("'Consistently with *Kumho*, the Rule as amended provides that *all types of expert testimony present questions of admissibility for the trial court* in deciding whether the evidence is reliable and helpful.'" (quoting Fed. R. Evid. 702, Advisory Committee Notes to 2000 Amendments) (emphasis added)).  In addition, Stewart's opinion that Poret fails to meet the requirements of the Manual improperly interferes with the jury's weighing of the evidence. *See, e.g.*, *Westcott v. Crinklaw*, 68 F.3d 1073, 1076 (8th Cir. 1995) ("[A]n expert may not go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility." (quotation omitted)).

Because Stewart has attempted to opine as to the legal admissibility of Poret's report, which is an issue reserved for the jury, Stewart's opinion that Poret "fails" to meet certain requirements of the Manual must be excluded from Stewart's report and his testimony at trial.

### III.   STEWART'S OPINIONS THAT ARE SPECULATIVE AND LACK A SUFFICIENT BASIS MUST BE EXCLUDED.

An expert must base his opinions on sufficient facts and he must consider all relevant facts. *Brooke Grp. Ltd.*, 509 U.S. at 242; *Concord Boat Corp.*, 207 F.3d at 1055; cases gathered *supra* n.1.  His opinion cannot be speculative.  *Onyiah v. St. Cloud State Univ.*, 684 F.3d 711, 720 (8th Cir. 2012) ("Expert testimony is inadmissible where . . . it is excessively speculative or unsupported by sufficient facts." (quotation omitted)); *Solheim Farms, Inc. v. CNH Am., LLC*, 503 F. Supp. 2d 1146, 1149 (D. Minn. 2007) ("Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case.").

Additionally, an expert must have a sufficient factual foundation to render his opinion; he cannot merely say "because I said so."  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Kemp*, 2000 WL 1062105, at *5 (noting that an "expert's bare opinions would usurp the Jury's factfinding function"); *see also Mooring Capital Fund, LLC v. Phoenix Cent., Inc.*, No. Civ-06-0006-HE, 2009 WL 4263359, at *5 (W.D. Okla. Feb. 12, 2009) ("[I]t is clear that an expert's opinions are not admissible merely because the expert says, in effect, 'trust me, I know.'" (citing *Gen. Elec. Co.*, 522 U.S. at 146)).

Stewart's opinions violate these basic Daubert principles time and again.  He fails to consider relevant evidence and renders speculative opinions without any basis, hoping the Court will simply trust him.  Such opinions must be excluded from presentation to the

jury.

**A.      Stewart's Opinions Regarding Secret Shoppers Are Speculative and Lack Any Basis.**

Stewart's report contains various opinions about the evidence of false advertising Select Comfort obtained through the use of secret shoppers (individuals who visited retail stores posing as customers).  For example, Stewart opines that the "interactions between the secret shoppers and retail sales personnel are … not representative of interactions of typical consumers who are actually shopping for a bed or mattress and retail sales personnel" and that "the secret shopper interactions in this case are highly atypical." (Patton Aff. Ex. 27 (Stewart Report at 11–12).)

These opinions are not based on any research or analysis and are entirely speculative.  Stewart has no idea whether the secret shoppers' interactions at issue in this case were typical or atypical of consumer interactions, as Stewart did not conduct any consumer survey or speak to any consumers regarding what constitutes a typical interaction with sales personnel.  (*See* Patton Aff. Ex. 26 (Stewart Dep. 55:18–19, 175:20–22).)   Nor did he conduct any observation of consumer interactions in comparison to secret shopper interactions or even ask any of Defendants' salespersons about any differences they experience in secret shopper interactions as compared to consumer interactions.  (*See id.* 55:18–56:4, 117:25–118:3).)  In his report, Stewart does not identify whether salespersons are able to identify which individuals in the store are customers compared to which are secret shoppers or whether and how salespersons respond to questions differently if they are even able to so identify.  (*See generally* Patton

Aff. Ex. 27 (Stewart Report); *see also* Patton Aff. Ex. 26 (Stewart Dep. at 116:17–119:6, 121:12–122:2).)

Stewart simply asserts that salesperson interactions with secret shoppers differ from salesperson interactions with customers, yet he does not explain how or why.  In essence, Stewart *assumes* that sales personnel always respond differently to secret shoppers than to consumers when posed with the same or similar question (e.g., questions related to Sleep Number beds).  However, such an assumption is not only speculative, but is directly contrary to the evidence in this case.  (*See* Patton Aff. Ex. 57 at Ans. Interrog. 3 Attachment A (listing false statements Mattress Firm sales personnel made to secret shoppers and to actual customers that are similar to one another).)  Stewart conveniently ignores this evidence that secret shopper interactions actually *are* representative of consumer interactions in the context of inquiries about Sleep Number products.

Again speculatively, Stewart goes on to opine that "the secret shopper interactions in this case . . . had the characteristics of an elaborate ruse designed to entrap retail sales personnel."  (Patton Aff. Ex. 27 (Stewart Report at 12).)  Not only does Stewart provide no citation to any evidence for this conclusion, but Stewart does have a sufficient basis for it either.  He cites to one email from a Select Comfort National Trainer who conducted secret shops.  (*See id.* at 11.)  But Stewart ignores the National Trainer's deposition testimony in which he clarified that he was not hoping to bait the salesperson into speaking negatively, instead he merely wanted to see what the salesperson had to say about Sleep Number.  (*See* Patton Aff. Ex. 12 (Trousdale Dep. 87:7–88:8).)  Moreover, citation to one mere email is not sufficient to support Stewart's broad conclusion that <u>all</u>

secret shoppers were engaged in an "elaborate ruse" in order to "entrap" retail sales personnel.   There is simply no sufficient basis for that statement, and it can only be categorized as speculative.

Stewart's opinions regarding secret shopper evidence must be excluded from his report and his testimony at trial in light of being speculative and without support.   *See Brooke Grp. Ltd.*, 509 U.S. at 242; *Onyiah*, 684 F.3d at 720; *Concord Boat Corp.*, 207 F.3d at 1055; *Solheim Farms, Inc.*, 503 F. Supp. 2d at 1149; cases gathered *supra* n.1;. Further, he should not be allowed to testify regarding his own assessment of secret shopper evidence as that would usurp the role of the jury in weighing the evidence.   *See Westcott*, 68 F.3d at 1076.

### B.    Stewart's Opinions Regarding Salesperson Incentives Are Speculative and Lack any Basis.

Stewart purports to opine regarding the incentives a salesperson possesses when attempting to sell a mattress to a consumer.   For example, he states, "The retail sales person would … have incentives to answer specific questions about such products in a generic way rather than give credence to a specific competitor."   (Patton Aff. Ex. 27 (Stewart Report at 9).)   Stewart also opines regarding consumers' awareness of such incentives.   He states, "[C]onsumers are well aware of the incentives for sales personnel to present positive information about the product they are selling and are therefore skeptical of claims by sales personnel."   (*Id.* at 14.)

Stewart's opinions regarding salesperson incentives are entirely speculative and not based on any empirical data or literature.   Stewart did not interview any salespersons

to discuss what their incentives are, cite any deposition testimony or other evidence to support these opinions, or conduct any research into the issue.  (*See id.*; *see* Patton Aff. Ex. 26 (Stewart Dep. 55:18–56:4, 117:25–118:3).)  Similarly, Stewart did not survey or question consumers to determine what, if any, incentives they are aware of and whether such incentives cause them to be skeptical of mattress salespersons.  (*See* Patton Aff. Ex. 26 (Stewart Dep. 55:18–19, 175:20–22).)  Therefore, Stewart's opinions are speculative, lack factual foundation, and must be excluded.  *See Brooke Grp. Ltd.*, 509 U.S. at 242; *Onyiah*, 684 F.3d at 720; *Concord Boat Corp.*, 207 F.3d at 1055; *Solheim Farms, Inc.*, 503 F. Supp. 2d at 1149; cases gathered *supra* n.1.

### C.     Stewart's Opinions Regarding Information on the Internet Are Speculative and Lack Any Basis.

Stewart purports to opine regarding the importance of information available to consumers on the internet.  In fact, he implies that the false and misleading advertising statements at issue in this litigation are true because negative reviews and complaints are available on the internet at websites such as pissedconsumer.com.  (Patton Aff. Ex. 27 (Stewart Report at 12–15).)  This conclusion must be excluded for at least three reasons.

First, as discussed above, Stewart is not allowed to legally opine on the ultimate truth or falsity of a specific statement.  *See Gold*, 82 F. Supp. 3d at 1068–69; *Innovation Ventures, LLC*, 90 F. Supp. 3d at 723–24; *see also AstraZeneca LP*, 444 F. Supp. 2d at 293–94.  Second, Stewart is not allowed to weigh the evidence available on the internet, as that is the role of the jury.  *See Westcott*, 68 F.3d at 1076.  Third, Stewart provides no support for the claim that if something is available on the internet, it must be true.

Taking the mold statement as an example, Stewart opines that it must be true because consumers as well as Select Comfort discuss mold on the internet. (Patton Aff. Ex. 27 (Stewart Report at 13) ("There are numerous websites that document the problems the Sleep Number beds have had with mold including a site apparently maintained by Select Comfort.").) This is completely speculative and without any basis.

With respect to the third party websites, Stewart did not vet their sources or determine that the individuals posting on them indeed experienced mold, indeed owned Sleep Number beds, and indeed were referencing a time period relevant to this litigation. Nor has Stewart analyzed whether salespersons have consulted these websites before making the false statements or whether consumers have reviewed them in deciding which mattress to purchase. There is simply no basis for Stewart to opine that unreliable third party internet postings speak truth and thus justify Defendants' false statements.

Similarly, there is no basis for Stewart's opinion that the mold statement must have truth because Select Comfort hosts a website discussing mold. Stewart appears to opine that consumers consult this website and thereafter determine that Sleep Number beds must get mold. He goes so far as to state that the website "would be especially likely to be perceived as credible by consumers" and "would also be likely to influence the purchase decisions of some consumers." (*Id.*) This is speculative, as Stewart cites no survey, no consumer interview, and no other evidence. And despite acknowledging that this website explains how Select Comfort's beds do <u>not</u> suffer from mold (not vice versa), Stewart opines that the website "would still have been likely to raise questions and concerns in the minds of consumers considering a Sleep Number bed." (*See id.* at

n.18 (citing *Sleep Number Facts*, SELECT COMFORT, sleepnumberfacts.com).)   This is, again, completely unsupported.

Stewart provides no citation, analysis, or research for his conclusions regarding information available on the internet that may or may not be reliable and accurate and that consumers may or may not believe and rely upon.   Stewart is essentially asking the Court to trust him without providing any factual foundation for his opinions.   Under applicable law, this is not allowed.   *See Gen. Elec. Co.*, 522 U.S. at 146; *Brooke Grp. Ltd.*, 509 U.S. at 242; *Concord Boat Corp.*, 207 F.3d at 1055; *Kemp*, 2000 WL 1062105, at \*5; *Mooring Capital Fund, LLC*, 2009 WL 4263359, at \*5; cases gathered *supra* n.1.

### D.   Stewart's Opinion Regarding Point Allocation Is Unreliable and Irrelevant.

Stewart attacks Poret's survey because it asked whether certain statements would influence a consumer's purchasing decision but did not ask whether certain *other* statements would also be influential.   (*See* Patton Aff. Ex. 27 (Stewart Report at 25–26).)   Stewart attempts to substantiate his opinion by describing a hypothetical assignment of points to the different factors that he believes may influence a consumer's decision in purchasing a mattress.   (*See id.*)   Specifically, Stewart arbitrarily assigns the following six factors with the following number of points (adding up to 100):

- Price – 30 points
- Comfort – 40 points
- Brand – 10 points
- Reason Product Not Sold by Retailer – 10 points
- Length of Warranty – 5 points
- Return Policy – 5 points

(*See id.* at 25.)  Stewart then opines that, because Poret did not ask questions to his survey respondents regarding all of these factors, Poret's survey "inflates the importance of relatively less important product information."  (*See id.* at 26.)

To establish reliability and satisfy the relevance requirement, Stewart was required to show that "the methodology underlying his conclusions is scientifically valid" and that his "methodology was applied properly to the facts of the case."  *Barrett*, 606 F.3d at 980 (quotation omitted).  Stewart's opinion regarding point allocation fails in both regards.

First, Stewart fails to explain how or why he decided upon his six factors with their specific number of points, nor does he explain why his hypothetical is scientifically valid, based in the real world, or properly applied given the facts in this case.  No witness testified that Stewart's list of factors is the proper list or that Stewart's hypothetical point assignments are valid.  Thus, his point allocation opinion is speculative, unreliable, and irrelevant under the Daubert standard.  It would only serve to confuse the jury into believing, without basis, that these are the factors consumers do consider and at the point level attributed to them.

Second, Stewart fails to consider what constitutes materiality under applicable law.  The false advertising element of materiality requires a showing that the statement at issue is likely to influence a consumer's purchasing decision.  *See 3M Innovative Props. Co. v. Dupont Dow Elastomers LLC*, 361 F. Supp. 2d 958, 968, 971 (D. Minn. 2005).  There is no requirement of a specific percentage or number of points in order for the statement at issue to be considered material—either the statement is likely to influence a purchasing decision or it is not.  *See id.*  Whether other factors also influence a

purchasing decision does not negate the influence of a particular statement—particularly when, as is the case here, the statement was made for the specific purpose of influencing consumers.  *See, e.g., ITEX Corp. v. Glob. Links Corp.*, 90 F. Supp. 3d 1158, 1173 (D. Nev. 2015) (stating that while customers consider multiple factors prior to joining a barter exchange network, defendant's statement as to one of these factors established materiality, particularly because it was defendant's purpose to influence consumers); *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1032, 1060–61 (D. Kan. 2006) (finding issue of fact on materiality when defendants' advertising included three of the six statements likely to influence customer purchasing decisions).  Stewart's attempt to imply that specific other factors are material, and that those factors negate the materiality of statements made by Defendants, is misleading and would be confusing to the jury, thus it must be excluded.

### E.   Stewart's Opinion Regarding Impact Analysis Lacks Any Basis and Is Irrelevant.

In one of his many attempts to attack Poret's consumer survey, Stewart opines that Poret's survey related to the commodity foam statement on the kill slide "does not reflect market realities."  (*See* Patton Aff. Ex. 27 (Stewart Report at 32).)  As purported evidence for that conclusion, Stewart applies a mathematical equation apparently meant to demonstrate the "untoward influence in the market" of the commodity foam statement. (*See id.* at 33.)  Stewart's equation multiplies (1) the rate of materiality yielded by Poret's survey, (2) by the number of customers Stewart guesses were actually exposed to the kill slide, (3) by the percentage of survey respondents Poret found attended to and understood

the statement.  (*See id.*)  The equation looks as follows:

$$\textbf{22.5\% x 5\% x 95\% = 1.05\%}$$

(*See id.*)  Based on this equation, Stewart opines that 1.05% is the rate by which the commodity foam statement on the kill slide influenced consumers.  (*See id.*)  But Stewart's opinion lacks any proper basis, relies on speculative assumptions, and is based on a fundamental misreading of Poret's survey and Select Comfort's claim.

First, although Stewart claims in his report that his equation demonstrates the "influence" of the kill slide (*see id.*), Stewart admitted in his deposition that he did not do any investigation one way or the other into whether the kill slide would be effective in influencing consumers to purchase a Tempur-Choice bed.  (*See* Patton Aff. Ex. 26 (Stewart Dep. 115:9–17).)  Nor does Stewart know whether the kill slide would dissuade a consumer interested in a Sleep Number bed from buying one.  (*Id.* at 115:25–116:5.)

Second, Stewart's equation attempts to place a value on the number of kill slide flyers distributed per week and the number of relevant salesperson/consumer interactions per week.  But Stewart fails to provide any factual basis for these assumptions.  (*See* Patton Aff. Ex. 27 (Stewart Report at 33).)  He admitted to having no knowledge of whether salespeople were trained to, and did, repeat the statements on the kill slide *orally* to customers.  (Patton Aff. Ex. 26 (Stewart Dep. 76:1–23, 81:13–21, 175:5–8).)  Nor did he factor in any indirect effect of the kill slide.  (*Id.* at 87:10–14.)  Further, despite assuming the existence of 20 relevant interactions per week, Stewart does not actually know how many customers ask about Sleep Number beds and did nothing to try to ascertain that number.  (*See id.* at 91:23–92:16, 158:16–159:6.)  In fact, Stewart admitted

that he does not know whether his arbitrary exposure rate percentage is even accurate. (*See id.* at 174:17–25.)   Thus, Stewart's equation is improper and cannot be used to support Stewart's conclusion.

Third, Stewart's attempt to attack Poret's survey for not taking into account the exposure rate of the flyer is without proper basis.  Stewart improperly assumes that Select Comfort is alleging, and that Poret concluded, that 22.5% of all *potential* consumers were impacted by the commodity foam statement on the kill slide—i.e. 22.5% of all individuals considering a mattress purchase.  Not so.  Select Comfort's claim, based on Poret's survey findings, is that 22.5% of those *actually* exposed to the statement on the flyer (in this case, the individual subjects of the survey) found it to be material. Obviously there were fewer consumers actually exposed to the kill slide than the number of all potential mattress buyers.  But that doesn't change the fact that 22.5% of those who were actually exposed found the commodity foam statement to be material, i.e. influential in making a mattress purchasing decision.

Importantly, Select Comfort's damages expert took into account the exposure rate and materiality percentage of the commodity foam statement when developing his damages model.  (*See* Patton Aff. Ex. 18 (Kenyon Report at 28) ("According to the Poret Report, 22.5% of respondents were less likely to purchase a Sleep Number bed as a result of the phrase 'commodity memory foam' . . . . Using this information, I multiplied Tempur's sales of Tempur Choice mattresses and related products sold by retailers identified as receiving the tear sheets by 22.5% to determine Tempur Choice sales influenced by the false advertising contained on the tear sheets."); *see also* at 31–32.)

Unlike Kenyon, it was not Poret's role to factor in any exposure rate, as Poret did not conduct any damages analysis or calculation.  Instead, Poret was tasked with conducting a materiality survey in which he assessed whether the statements on the kill slide would be material to consumers *if and when* they were exposed to them (which of course they were during the course of the survey).  Accordingly, Stewart's criticism is without basis, confuses the fundamental purpose of Poret's survey, is simply not helpful to the fact finder, and is inadmissible.

Because Stewart's mathematical equation lacks sufficient basis, is speculative, and ignores the purpose of Poret's survey, Stewart's opinions regarding exposure rate must be excluded.  *See Gen. Elec. Co.*, 522 U.S. at 146; *Brooke Grp. Ltd.*, 509 U.S. at 242; *Concord Boat Corp.*, 207 F.3d at 1055; *Mooring Capital Fund, LLC*, 2009 WL 4263359, at *5; *Kemp*, 2000 WL 1062105, at *5; cases gathered *supra* n.1.

## IV.   SECTION A OF STEWART'S EXPERT REPORT AND OPINIONS MUST BE EXCLUDED BECAUSE HIS REPORT IS AN IMPROPER REBUTTAL REPORT.

When an expert's opinion goes beyond proper rebuttal, that expert's opinion should be excluded from trial.  *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 468 (S.D.N.Y. 2010) (granting motion in limine seeking to limit an expert's testimony because it was "beyond the proper scope of . . . a rebuttal witness"); *Huskey v. Ethicon, Inc.*, No. 2:12-CV-05201, 2014 WL 3861778, at *5 (S.D.W. Va. Aug. 6, 2014) (granting motion in limine to exclude opinions from a rebuttal expert witness which were "new opinions" and not "expressly in rebuttal" to a primary expert witness's opinions); *Walker v. Yellow Freight Sys., Inc.*, No. CIV. A. 98-

3565, 1999 WL 955364, at *8 (E.D. La. Oct. 19, 1999) (excluding a rebuttal expert witness because his report went "well beyond the scope" of the proposed testimony from the expert witness he was offered to rebut).

A. **The Scheduling Order Required that All Affirmative Expert Reports Be Served on the First Operative Deadline and that All Rebuttal Expert Reports Be Served on the Second Operative Deadline.**

The applicable scheduling order in this case set two deadlines for disclosure of experts and their reports under Rule 26 of the Federal Rules of Civil Procedure. (Dkt. No. 155.) The first deadline—March 6, 2015—was for "affirmative experts" and the second deadline—April 17, 2015—was for "rebuttal experts." (*Id.*) The parties specifically negotiated this language and agreed that the affirmative deadline applied to all parties regardless of burden of proof. (Dkt. 201 – Ex. 2.) If any party planned to offer affirmative opinions not intended to rebut the opinions of a previously-disclosed expert, the disclosure was due on the affirmative deadline. (*Id.*) Under this language, the rebuttal deadline was limited to experts who would rebut the opinions of experts disclosed on the affirmative deadline. (*Id.*); *see 3M Innovative Props. Co. v. Barton Nelson, Inc.*, No. CIV.02-3591, 2004 WL 1774528, at *4–5 (D. Minn. Aug. 8, 2004) (analyzing similar scheduling order that used words "initial" reports and "rebuttal" reports and holding report that did not rebut previously disclosed expert was untimely when submitted on rebuttal deadline).

Defendants disclosed Stewart and his report on April 17, 2015, the rebuttal deadline. Select Comfort moved to strike Section A of Stewart's report as untimely, arguing that it does not rebut any expert opinions disclosed by Select Comfort. (*See* Dkt.

Nos. 200, 230.)   In opposition, Defendants argued that Section A of Stewart's report provides "the foundation and background for the remainder of Dr. Stewart's analytical critiques of the Poret and Joachimshaler report" (experts timely disclosed by Select Comfort).  (Dkt. No. 219 at 12–13.)

The Court denied Select Comfort's motion based on Defendants' characterization that Section A of Stewart's report describes broad concepts upon which Stewart expands in his critiques of Poret and Joachimsthaler and held that the disclosure was timely to the extent Stewart's opinions rebut those opinions.  (Dkt. No. 249 at 7–8.)  In so holding, the Court specifically noted that it declined to analyze the content of the expert reports at that time.  (*Id.* at 7 ("[T]he level of analysis Select Comfort seeks is more properly within the discretion of Judge Frank, the trial judge, who will have the opportunity to hear the affirmative experts' testimony and evidence and evaluate how rebuttal evidence and testimony are used.").)  Instead, the Court deferred to Daubert motions the determination of whether Section A of Stewart's report is admissible to rebut Poret and Joachimsthaler.  (*Id.* at 3.)  Specifically, the Order states that the "Court notes that its analysis is limited only to the characterization of these expert reports as rebuttal for the purposes of compliance with the pretrial scheduling order; any argument about the admissibility of the expert reports at trial is within the discretion of the Honorable Donovan W. Frank as the trial judge."  (*Id.*)  Because Section A of Stewart's report does not rebut Poret's or Joachimsthaler's opinions, the opinions set forth in Section A are not proper rebuttal and must be excluded.

**B.** **Section A of Stewart's Expert Report Consists of Affirmative Opinions, Not Rebuttal Opinions.**

Stewart testified that paragraphs 1–6 of Section A of his report were not drafted to rebut <u>any</u> of Select Comfort's experts. (*See* Patton Aff. Ex. 26 (Stewart Dep. 31:10– 34:13).) Stewart's Section A stands in stark contrast to Sections B and C, which clearly and directly critique Poret and Joachimsthaler, respectively. (*See* Patton Aff. Ex. 27 (Stewart Report at 16–35).)[3] It is hardly surprising that Stewart does not rebut Poret and Joachimsthaler in paragraphs 1–6 of Section A because those paragraphs do not even *mention* Poret or Joachimsthaler, and instead contain opinions centered around the advertising at issue in this case. (*See id.* at 6–15.) Although Stewart does offhandedly mention Poret in paragraph 7 of Section A, his opinions in that paragraph do not relate to Poret's opinions of meaning and materiality and instead relate to the factual basis for statements at issue in this litigation. (*Compare* Patton Aff. Ex. 27 (Stewart Report at 15– 16) *with* Patton Aff. Ex. 23 (Poret Report at 5).)

Stewart may claim that his opinions in Section A, although not true rebuttal, are otherwise <u>relevant</u> to the opinions of Poret and Joachimsthaler. (*See* Patton Aff. Ex. 26 (Stewart Dep. at 33:2–7, 34:2–7).) But <u>relevance is not the test</u> for whether an expert's opinions are proper rebuttal. Instead, the test is whether the expert explains, repels,

---

[3] Section B begins, "I have reviewed the report of the Poret Survey and find the two surveys described in the report to be fatally flawed." (Patton Aff. Ex. 27 (Stewart Report at 16).) Section C begins, "I have reviewed the report of Dr. Joachimsthaler. He offers no empirical data and his conclusions related to the claims at issue in this matter are not supported by data, literature, or logic." (*Id.* at 34.) These introductory sentences are noticeably different from the introductory sentence of Section A, which states, "There is little evidence of significant dissemination of negative information regarding Sleep Number beds by Tempur Sealy . . . or Mattress Firm. (*See id.* at 6.)

counteracts, or disproves evidence of the adverse party.  *Marmo*, 457 F.3d at 759.

Stewart's opinions in Section A do not do any of these things.  Instead, they are separate

affirmative opinions, not rebuttal opinions and not even background information for

rebuttal opinions.  (*See* Patton Aff. Ex. 27 (Stewart Report at 6–15).)  Indeed, the

paragraphs of Section A contain the following very specific <u>affirmative</u> opinions:

- **Section A, Introduction (*id.* at 6)** – Stewart opines that "there is little evidence of significant dissemination of false negative information regarding Sleep Number beds by Tempur Sealy or Mattress Firm or that this information had any influence on the purchase behavior of consumers"

- **Section A, ¶ 1 (*id.* at 6-7)** – Stewart opines as to his view of "the 'negative' claims at issue"

- **Section A, ¶ 2 (*id.* at 7-8)** – Stewart opines as to the following:

  - "comparative advertising and superiority claims such as those in [the kill slide] flier are common"

  - "the likely influence of this flier on consumers is small"

  - distribution of the kill slide was "very small in scope relative to national advertising or even local advertising"

  - "[a]ny direct effect would be limited to consumers who were exposed to and attended to the flier while in the store who heard these claims repeated by a retail sales person"

  - the distribution of the kill slide "does not constitute broad dissemination"

- **Section A, ¶ 3 (*id.* at 8-9)** – Stewart opines as to the following:

  - "[t]here is no incentive for a retail sales person to discuss a product that is not carried in the retail store for which they work unless specifically asked by a customer"

  - "few customers asked for a comparison with the Sleep Number products"

  - "it would be to the benefit of the retail sales person to return the

conversation to products he/she could sell"

- o "[t]he retail sales person would also have incentives to answer specific questions about such products in a generic way" and "[t]here is evidence that this occurred in the present matter"

- **Section A, ¶ 4 (*id.* at 10-12)** – Stewart opines as to the following:

  - o some "customers' purchase behavior was certainly not influenced by the claims"

  - o some customers "still visited the Sleep Number store, suggesting that the statements did not dissuade them from considering Sleep Number"

  - o "the intent of the Select Comfort employee secret shopper visits was similarly to explicitly elicit negative comments about the Sleep Number bed"

  - o "secret shoppers asked for specific comparisons to Sleep Number beds to the point of seeming unusual on occasion"

  - o "some secret shoppers offered negative information about Sleep Number beds . . . in an effort to elicit agreement or further negative comments"

  - o "interactions between the secret shoppers and retail sales personnel are therefore not representative of interactives of typical consumers"

  - o "secret shopper interactions in this case are highly atypical and had the characteristics of an elaborate ruse designed to entrap retail sales personnel"

  - o "the context within which 'disparaging' comments occurred is important and evidence indicates that these contexts were often created by the secret shopper"

- **Section A, ¶ 5 (*id.* at 12-15)** – Stewart opines as to the following:

  - o "[m]uch of the same 'negative' information to which plaintiff objects is readily available to consumers on various Websites"

  - o the Sleep Number website discussing mold "would be especially likely to be perceived as credible by consumers" and "would also be likely to influence the purchase decisions of some consumers"

- o "[a] highly involved purchaser of a mattress would seek out such [online] information before visiting a retail store and certainly before making a purchase"

- o "[s]uch sources of [online] information would be far more influential than any retail sales person's comments because (1) some of these sources are highly credible . . . , and (2) consumers are well aware of the incentives for sales personnel to present positive information about the product they are selling and are therefore skeptical of claims by sales personnel"

- o "time devoted to disparaging a competitor . . . has the potential to create a negative response on the part of the customer"

- **Section A, ¶ 6 (*id.* at 15)** – Stewart opines regarding "the common practices of comparative advertising and comparative selling, as well as puffery," which he opines that Select Comfort has conflated with unambiguously false claims

- **Section A, ¶ 7 (*id.* at 15-16)** – Stewart opines as to the following:

  - o "[t]here is ample evidence that Sleep Number beds have mold problems and that some consumers are dissatisfied with Sleep Number products"

  - o "[i]t is not unreasonable, and certainly not misleading, for a sales person to answer a direct question about why his or her firm does not carry a product, such as the Sleep Number bed, by referring to their own personal prior experience or to what they may have heard from others"

Each of these opinions are undoubtedly affirmative opinions, proving that Section A was not meant to rebut Poret or Joachimsthaler. Among other things, Section A contains opinions related to the dissemination of the specific advertising at issue in this case, retail salesperson incentives, the proprietary of secret shopper evidence, the practice of comparative advertising, factors influencing consumers, and the factual basis for certain statements. Poret and Joachimsthaler do not opine as to these same opinions and thus Stewart was not explaining, repelling, counteracting, or disproving their opinions.

At any rate, Stewart does not even refer to their opinions in Section A of his report (the only exception being Stewart's offhanded reference to Poret in a paragraph related to opinions outside those in response to Poret's survey).[4]

It is clear that Stewart's Section A opinions stand alone as opinions Stewart believes he has the expertise to provide to the jury (though whether they are actually admissible is another matter).  They do not stand as rebuttal to Poret and Joachimsthaler. Therefore, they must be excluded for their failure to be presented as rebuttal to any Select Comfort expert witness.

## CONCLUSION

For the reasons stated herein, Select Comfort respectfully requests that the Court exclude the opinions asserted in Stewart's expert report that (1) constitute legal conclusions, (2) assert that Poret's survey "fails" to meet certain requirements in the Manual for Complex Litigation, and (3) are speculative and lack a sufficient legal basis— e.g. his opinions regarding evidence obtained through secret shoppers, the incentives of retail salespersons, the impact of negative information available on the internet, and the way in which to measure the impact of the false statements at issue in this case.  Select Comfort also requests that the Court exclude the entirety of Section A of Stewart's expert report as improper rebuttal.

---

[4]   In fact, Stewart's reference to Poret in paragraph 7 of his report is that "Mr. Poret does not purport to test consumer reaction to many of the claims to which plaintiff objects." (Patton Aff. Ex. 27 (Stewart Report at 15).)  The remainder of paragraph 7 does not rebut what Poret did; instead, it relates to something Poret did not do— namely, determine whether there is "ample evidence" that certain of the claims at issue in this litigation were lawfully made.  (*See id.* at 15–16.)  Hence, it cannot constitute rebuttal.

Dated:  January 29, 2016          **FOX ROTHSCHILD LLP**

By:     s/Dennis E. Hansen
        Andrew S. Hansen   (#285894)
        Samuel R. Hellfeld  (#390954)
        Dennis E. Hansen    (#386734)
        Aaron Mills Scott    (#33943X)
        Elizabeth A. Patton  (#391431)

Campbell Mithun Tower -- Suite 2000
222 South Ninth Street
Minneapolis, Minnesota  55402

Telephone:   (612) 607-7000
Fax:         (612) 607-7100
E-Mail:      ahansen@foxrothschild.com
             shellfeld@ foxrothschild.com
             dhansen@ foxrothschild.com
             ascott@ foxrothschild.com
             epatton@ foxrothschild.com

**ATTORNEYS FOR PLAINTIFF
SELECT COMFORT CORPORATION**