# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Select Comfort Corporation,

                    Plaintiff,

v.

Tempur Sealy International, Inc., d/b/a/
Tempur-Pedic; and Mattress Firm, Inc.,
d/b/a Mattress Firm,

                    Defendants.

Civil No. 13-2451 (DWF/SER)

**MEMORANDUM
OPINION AND ORDER**

---

Andrew S. Hansen, Esq., Dennis E. Hansen, Esq., Samuel R. Hellfeld, Esq., Aaron Mills Scott, Esq., and Elizabeth A. Patton, Esq., Fox Rothschild LLP, counsel for Plaintiff.

Arthur S. Beeman, Esq., Matthew Wright, Esq., and Pamela M. Deese, Esq., Arent Fox LLP; and John W. Ursu, Esq., Robert J. Gilbertson, Esq., and X. Kevin Zhao, Esq., Greene Espel PLLP, counsel for Defendant Tempur Sealy International, Inc., d/b/a Tempur-Pedic.

Brian D. Roche, Esq., Christopher R. Hoffman, Esq., Jennifer DePriest, Esq., Jillian Burstein, Esq., Leonard E. Hudson, Esq., Vanessa Marti Heftman, Esq., and William Weltman, Esq., Reed Smith LP; and David T. Schultz, Esq., and Michael C. McCarthy, Esq., Maslon LLP, counsel for Defendant Mattress Firm Holding Corp., d/b/a Mattress Firm.

---

## INTRODUCTION

This matter is before the Court on Defendant Tempur Sealy International, Inc.,

d/b/a Tempur-Pedic's ("Tempur-Pedic") Motion to Exclude the Expert Testimony of

Joseph D. Kenyon (Doc. No. 268); Defendant Mattress Firm Holding Corp., d/b/a

Mattress Firm's ("Mattress Firm") Motion to Exclude Expert Testimony of Joseph D.

Kenyon (Doc. No. 312); Mattress Firm's Motion to Exclude Testimony of Hal Poret

(Doc. No. 298); Tempur-Pedic and Mattress Firm's Joint Motion to Exclude Expert

Testimony of Hal Poret (Doc. No. 281); Tempur-Pedic and Mattress Firm's Joint Motion

to Exclude Expert Testimony of Erich Joachimsthaler (Doc. No. 307); Plaintiff Select

Comfort Corporation's ("Select Comfort" or "Plaintiff") Motion to Exclude the Expert

Testimony of Brian Fogg (Doc. No. 276); Plaintiff's Motion to Exclude the Expert

Testimony of David Stewart (Doc. No. 279); Plaintiff's Motion to Exclude Expert

Testimony of Jeffery A. Stec (Doc. No. 284); Plaintiff's Motion to Exclude Testimony of

Kristopher A. Boushie (Doc. No. 289); and Plaintiff's Motion to Exclude Expert

Testimony of Bernhard Kuchel (Doc. No. 292).  The Court considers the motions below.

## BACKGROUND

Select Comfort designs, manufactures, and markets mattresses and bedding

products, including its Sleep Number bed, which uses air chambers to provide a cushion

of support that can be adjusted based on individual preference.  (Doc. No. 8, Am. Compl.

¶ 9.)  Select Comfort sells products under the Sleep Number® brand, which is

trademarked under uncontested registrations.  (*Id.* ¶¶ 9-10.)  Select Comfort sells its

products nationwide at Select Comfort retail stores, through direct marketing operations,

and through the Select Comfort websites at selectcomfort.com and sleepnumber.com.

(*Id.* ¶ 14.)

Tempur-Pedic is a bedding manufacturer, with several mattress brands.

Tempur-Pedic beds are sold through multiple sales channels, including bedding retailers

and department stores.  Tempur-Pedic competes with Plaintiff in the specialty mattress

and bedding industry, selling alternatives to traditional innerspring mattresses.  (*Id.* ¶ 19.)

2

Tempur-Pedic has traditionally focused on foam slab mattresses comprised of memory foam.  (*Id*.)  In the spring of 2013, Tempur-Pedic launched the Tempur-Choice line of adjustable air beds.  (*Id*. ¶ 20.)  The Tempur-Choice line of beds features adjustable air mattresses with memory-foam surrounding air chambers that can be adjusted.  (*Id*.)  The Tempur-Choice beds compete directly with Plaintiff's Sleep Number M-Series beds, also which feature memory foam surrounding adjustable air chambers.  (*Id*. ¶ 21.)

Mattress Firm is a bedding retailer offering various brand-name bedding products.  Mattress Firm sells Tempur-Pedic products and previously sold Select Comfort products.

In this action, Plaintiff alleges that Defendants have disseminated false representations about Select Comfort and its products.  Specifically, Plaintiff alleges that Defendants have made at least the following false and disparaging comments:  (1) Select Comfort's warranty is shorter than it actually is; (2) Sleep Number beds are defective, and Mattress Firm stopped selling them as a result; (3) Select Comfort does not honor its warranty; (4) Sleep Number beds grow mold; (5) Sleep Number beds are made from "cheap," "commodity" foam; (6) Sleep Number beds suffer from "hammocking;"[1] and (7) a number of class action lawsuits are pending against Select Comfort.  For example, Plaintiff alleges that as part of its advertising efforts, Tempur-Pedic made a series of claims when comparing the Tempur-Choice to Plaintiff's Sleep Number M-Series beds, including:  (1) Sleep Number's beds contain "commodity memory foam;" (2) Sleep

---

[1]     "Hammocking" refers to a mattress's propensity to allow the heavier regions of a sleeper's body to sink or deform the mattress.

Number's beds hammock; and (3) Sleep Number's beds come with a 20-Year Limited Warranty.  (*Id.* ¶¶ 23, 25, 29.)  These claims were distributed via a flyer (the "Flyer") to consumers in retail locations across the country.[2]  (Doc. No. 303 ("Patton Aff.") ¶ 56, Ex. 55 at Answer 17 & Ex. A.)



(Am. Compl. ¶ 25, Ex. C.)

---

[2]     The comparative information in the Flyer (also referred to as the "tear-sheet") originated from a slide that was part of a presentation given by Tempur-Pedic internally to introduce the Tempur-Choice line.  (Patton Aff. ¶ 3, Ex. 2 ("Campbell Dep.") at 84-87.) The information in the slide was eventually made into a "tear-pad," which was a packet of fifty "tear-sheets" or Flyers.  (*Id.* at 84-87, 103-10.)

Plaintiff also alleges that Tempur-Pedic developed training materials containing misrepresentations, that Mattress Firm used those materials, and that Mattress Firm employees relayed false representations and product comparisons to customers as part of a pervasive scheme of false advertising. Plaintiff points to evidence that Mattress Firm salespersons nationwide have disseminated oral statements about Plaintiff, including that Sleep Number beds develop mold and that Mattress Firm chose to stop selling Sleep Number due to quality issues. (Patton Aff. ¶ 58, Ex. 57 at Answer 3.) In addition, Mattress Firm salespersons disseminated allegedly false claims contained in the Flyer to customers and Plaintiff argues that the false statements were made purposefully to prevent customers from purchasing Select Comfort's products. Plaintiff asserts that these activities have caused harm to its sales, reputation, and goodwill.

In this action, Plaintiff asserted twelve claims—all against Mattress Firm and ten against both Defendants.[3] On December 23, 2013, the Court granted in part Plaintiff's motion for a temporary restraining order, enjoining Mattress Firm from making various

---

[3]     The asserted claims include: (1) unfair competition in violation of 15 U.S.C. § 1125(a); (2) false advertising in violation of 15 U.S.C. § 1125(a); (3) deceptive trade practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44, *et seq.*; (4) unlawful trade practices in violation of the Minnesota Unlawful Trade Practices Act, Minn. Stat. § 325D.09, *et seq.*; (5) false statements in advertising in violation of the Minnesota False Statement in Advertising Act, Minn. Stat. § 325F.67; (6) consumer fraud in violation of the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69; (7) unjust enrichment; (8) unfair competition constituting product disparagement; (9) deceptive trade practices by product disparagement in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44, subd. 1(8); (10) business defamation; (11) tortious interference with prospective economic advantage; and (12) trademark infringement in violation of 15 U.S.C. § 1114(1) (the "Lanham Act"). (Am. Comp. ¶¶ 115-142.)

representations to consumers regarding Plaintiff and its products, including the Sleep

Number brand.  (Doc. No. 59.)  Mattress Firm previously moved to dismiss Counts Four,

Five, and Six of Plaintiff's Complaint, each of which were brought under the Private

Attorney General Statute, Minn. Stat. § 8.31.  In an Order dated April 8, 2014, the Court

granted Mattress Firm's Motion to Dismiss Counts Four, Five, and Six of Plaintiff's First

Amended Complaint and dismissed those claims with prejudice, after finding that

Plaintiff alleged insufficient facts to establish a public benefit under the Private Attorney

General Statute.  (Doc. No. 74.)

The parties now move to exclude the testimony of various expert witnesses.

## DISCUSSION

## I.    Legal Standard

Before accepting the testimony of an expert witness, the trial court is charged with

a "gatekeeper" function of determining whether an opinion is both relevant and reliable.

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-90 (1993); *Aviva Sports, Inc. v.*

*Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 820 (D. Minn. 2011).  Under Federal

Rule of Evidence 702, which governs the admission of expert testimony, an expert may

testify if:  (1) the expert's scientific, technical, or other specialized knowledge will help

the fact-finder to understand the evidence or determine a fact in issue; (2) the testimony is

based on sufficient facts or data; (3) the testimony is the product of reliable principles and

methods; and (4) the expert has reliably applied those principles and methods to the facts

of the case.  Fed. R. Evid. 702; *see also Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686

(8th Cir. 2001).

The Court also notes that "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony," and it favors admissibility over exclusion. *Lauzon*, 270 F.3d at 686.  When examining an expert opinion, a court applies a general rule that "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (citation and quotation omitted).  "[I]f the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury," then it must be excluded. *Id.* at 30.  In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court concluded that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." 526 U.S. at 152.  The proponent of the evidence has the burden of establishing by a preponderance of the evidence that testimony is admissible. *Lauzon*, 270 F.3d at 686.

## II.    Damages Experts

Under the Lanham Act, any award of damages must serve as compensation, not a penalty.  15 U.S.C. §1117(a) (in a successful claim under the Lanham Act, "the plaintiff shall be entitled . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. . . ." and the award "shall constitute compensation and not a penalty").  To recover money damages, a plaintiff "must prove both actual damages and a causal link between defendant's violation and those damages." *Aviva Sports, Inc.*, 829 F. Supp. 2d at 815 (citation omitted); *see also 3M Innovative Props., Co. v. Dupont Dow Elastomers LLC*,

361 F. Supp. 2d 958, 972 (D. Minn. 2005) ("The Eighth Circuit requires the plaintiff to prove causation in fact in a non-comparative advertising case.").  In an action for money damages where a defendant only misrepresents its own product without specifically targeting a competitor's, "plaintiff may be only one of many competitors, and without proof of causation and specific injury each competitor might receive a windfall unrelated to its own damage." *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1335-36 (8th Cir. 1997).  Causation and injury will be presumed in comparative false advertising claims where the competitor violated the Lanham Act willfully and in bad faith.  *See Zerorez Franchising Sys., Inc. v. Distinctive Cleaning, Inc.*, Civ. No. 13-2326, 2016 WL 2637801, at *4 (D. Minn. May 6, 2016).

Disgorgement of profits might also be available under the Lanham Act, subject to the principles of equity.  *See* 15 U.S.C. § 1117(a).  "Disgorgement exists to deter would-be infringers and to safeguard against unjust enrichment." *Masters v. UHS of Del., Inc*., 631 F.3d 464, 473 (8th Cir. 2011).  Disgorgement of profits for violation of the Lanham Act can be based on unjust enrichment, as a measure of plaintiff's damages, or as deterrence for willful behavior.  *See id.* at 474.  To recover disgorgement profits, "the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a); *see also Aviva*, 829 F. Supp. 2d at 818-19 (holding that to recover profits, plaintiff must only prove defendant's sales of the allegedly falsely advertised products, and defendant has the burden to prove the sales were not due to the allegedly violative conduct) (citing *Rexall Sundown, Inc. v. Perrigo Co*., 707 F. Supp. 2d 357, 359 (E.D.N.Y. 2010)).

Finally, in false advertising cases, corrective advertising is a recognized theory of damages. *See Zerorez Franchising Sys.*, 2016 WL 2637801, at *4 ("Corrective advertising is a recognized theory of damages in a trademark infringement action.").

Plaintiff has disclosed Joseph D. Kenyon ("Kenyon") as a damages expert; Mattress Firm has disclosed Jeffrey A. Stec ("Stec") as a rebuttal damages expert; and Tempur-Pedic has disclosed Kristopher A. Boushie ("Boushie") as a rebuttal damages expert.

### A.    Joseph D. Kenyon

Tempur and Mattress Firm move separately to exclude Kenyon's testimony. Kenyon is a Certified Public Accountant, Certified Fraud Examiner, Accredited in Business Valuation, and Certified in Financial Forensics.[4]  (Doc. No. 272 ("Wright Decl.") ¶ 3, Ex. 2 ("Kenyon Report") at App'x XIII.)  Plaintiff retained Kenyon to assess economic harm suffered by Plaintiff as a result of Defendants' conduct.  (Kenyon Report at 1.)

### 1.    Tempur-Pedic's Motion

With respect to Tempur-Pedic, Kenyon offers opinions on Plaintiff's damages resulting from the allegedly false and misleading comparisons of Tempur-Choice and the Sleep Number M-Series beds contained in the Flyer.  (Kenyon Report at 26; Patton Decl. ¶ 20, Ex. 19 (Supp. Kenyon Report) at 5.)  As discussed above, these comparisons

---

[4]    Tempur-Pedic does not challenge Kenyon's qualifications, but instead argues that his damages opinion based on the disgorgement of Tempur-Pedic's profits lacks adequate foundation, is speculative, and contains various methodological defects.

contained alleged false representations about "hammocking" and the use of "commodity foam" in Sleep Number beds.  (Kenyon Report at 26.)  Kenyon calculates a range of damages based on the disgorgement of Tempur-Pedic's profits, offering a "low-end" damage calculation of $823,000 based on the disgorgement of profits related only to Tempur-Choice mattresses (Supp. Kenyon Report at 5 & Revised Appendix VIII), and a "high-end" damage calculation of $4.38 million based on disgorgement of Tempur-Pedic's overall profits.  (Kenyon Report at 32 & Appendix IX.)

The two models Kenyon uses to calculate his disgorgement damages are summarized below.  First, Kenyon's "low-end" disgorgement figure is based on Tempur-Pedic's sales of Tempur-Choice mattresses and related products.  Kenyon then deducts sales from his analysis by, for example, identifying and accounting for only those retailers for which there is evidence that they received training to use the allegedly false product comparisons or received the false comparisons in written form, limiting his analysis to Tempur-Pedic's top fifty retailers, limiting the disgorgement period to May 2013 through December 2013 (based on evidence that retailers continued to use the comparisons until that point), excluding sales of floor model beds, accounting for sales to customers likely to be influenced by some of comparisons based on Poret's survey evidence (discussed below), and adjusting for Tempur-Choice's gross profit margin. (Kenyon Report at 26-28; Kenyon Supp. Report at 5.)  Second, Kenyon's "high-end" disgorgement figure is based on sales of all Tempur-Pedic mattresses (not just Tempur-Choice) on the theory that all such mattress sales benefited from the false statements.  Kenyon again deducts sales from this analysis, taking the same steps as he

did with the "low-end" figure, and further reducing sales by including only stores that had a Tempur-Choice mattress on the store floor and limiting the analysis to consumers who were interested in Sleep Number. (Kenyon Report at 30-31.)

Tempur-Pedic argues that Kenyon's opinions should be excluded because: (1) Plaintiff does not have a legal basis to seek an award of money damages from Tempur-Pedic; and (2) the opinions do not meet the requirements for reliability and admissibility.

First, Tempur-Pedic argues that Kenyon's damages opinions are moot because in the absence of evidence of the required elements of injury, causation, and bad faith, there is no reason to permit Kenyon to offer an opinion on any calculation of damages and, in particular, disgorgement of profits.[5]  Citing to the deposition testimony of Plaintiff's Senior Director of Finance, training slides presented to Plaintiff's sales representatives, the history of the use of the Flyer, and information conveyed in public earnings calls,

---

[5]     On November 6, 2015, Magistrate Judge Steven E. Rau found that Plaintiff had not met its burden to establish a *prima facie* case that Tempur-Pedic acted in bad faith or with deliberate disregard so as to warrant an amendment to Plaintiff's complaint adding a claim for punitive damages. (Doc. No. 252.) The Court affirmed that ruling. (Doc. No. 261.) Tempur-Pedic argues that this is relevant to the availability of disgorgement damages because Plaintiff must show that Tempur-Pedic acted willfully or in bad faith to recover disgorgement profits. Plaintiff, on the other hand, has pointed to caselaw supporting the notion that willfulness is not required to obtain disgorgement damages. *See, e.g.*, *Wildlife Research Ctr., Inc. v. Robinson Outdoors, Inc.*, 409 F. Supp. 2d 1131, 1136 (D. Minn. 2005) ("To hold that willfulness is nonetheless required for false advertising claims would contradict the plain language of section 1117(a)."); *Aviva Sports, Inc.*, 829 F. Supp. 2d at 818 n.14 (concluding that willfulness is not required). Recognizing that there is a dispute over the state of the law on this issue, the Court need not resolve that dispute now, as these arguments are more appropriately addressed on summary judgment.

Tempur-Pedic submits that there is no evidence that Tempur-Choice had a negative impact on Plaintiff's business at all. In addition, Tempur-Pedic submits that Kenyon did not analyze whether Plaintiff lost a single sale or whether Tempur-Pedic had gained a sale as a result of the alleged false comparisons in the Flyer and, instead that Kenyon erroneously assumed that to be the case. Tempur-Pedic argues that because Kenyon does not offer any opinion concerning the predicate issues of injury or causation, there is no basis for considering Kenyon's opinion and his testimony should be excluded.

The Court disagrees and concludes that in this case it is not unreasonable for Kenyon to assume liability in making his calculations as to disgorgement damages. *See, e.g.*, *Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 F. App'x 479, 487 (6th Cir. 2002) (explaining that challenges to central questions of liability are properly presented to the jury); *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, Civ. No. 09-61490, 2011 WL 2295269, at *3 (S.D. Fla. June 8, 2011) (explaining that an expert witness may assume liability for purposes of calculating damages). The issue of whether disgorgement of profits, under the facts of this case, is an available remedy will be for the Court on summary judgment or for the jury at trial.[6]

---

[6]     In its Introduction, Tempur-Pedic cites to *Lexmark Int'l., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014) for the proposition that to prevail on a Lanham Act claim, a plaintiff must plead and ultimately prove an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations. (Doc. No. 270 at 1.) Tempur-Pedic submits that, under *Lexmark*, Kenyon's opinions on damages are irrelevant and should be excluded because there is no evidence that Tempur-Pedic's sale of the Tempur-Choice mattresses had a negative impact on Plaintiff's business. The Court declines to reach this issue, as liability is more appropriately considered at summary judgment or trial.

Second, Tempur-Pedic argues that Kenyon's disgorgement calculations lack adequate foundation and that his analysis is not reliable.  Specifically, Tempur-Pedic argues that Kenyon did not distinguish between Tempur-Choice sales made lawfully and those based on allegedly actionable conduct, and that Kenyon failed to evaluate the effects of other market factors that influence purchasing decisions, such as Tempur-Pedic's brand equity, the price of Tempur-Pedic's mattress products, product comfort, aesthetics or other features unique to specific mattresses, retailer promotions, or whether Sleep Number retail stores are geographically proximate to the stores that received Flyers.  In addition, Tempur-Pedic argues that Kenyon made erroneous factual assumptions about the distribution of the tear-pads, which created a significant error in his conclusions.  Finally, Tempur-Pedic argues that Kenyon's reliance and use of Poret's consumer survey results casts significant doubt on Kenyon's analysis and opinions.

As discussed above, in a disgorgement analysis, Plaintiff need only prove Tempur-Pedic's sales of the allegedly falsely advertised products.  *Aviva Sports*, 829 F. Supp. 2d at 819.  Even so, in his report Kenyon attempts to account for and exclude sales that were not impacted by the false advertising.  Tempur-Pedic's remaining arguments with respect to Kenyon's failure to properly calculate disgorgement damages go to the factual basis for Kenyon's calculations.  Therefore, these arguments challenge the weight of Kenyon's testimony, and not the admissibility of his opinions.  The Court finds that Kenyon's "low-end" disgorgement model is based on sufficient facts and is the product of reliable principles and methods.

Tempur-Pedic also challenges Kenyon's alternative "high-end" disgorgement calculation of $4.3 million.  This calculation accounts for Tempur-Pedic's profits from sales of *all* Tempur-Pedic products, not just Tempur-Choice.  Tempur-Pedic argues that this calculation suffers from the same flaws outlined above, and in addition, that there are no legal grounds for Plaintiff to seek disgorgement of profits for Tempur-Pedic's sales of unrelated products.  On the latter point, the Court agrees.  Tempur-Choice is the only Tempur-Pedic product with the same feature as the Sleep Number bed—the ability to separately adjust mattress firmness on either side of the bed.  Tempur-Pedic's other mattress lines (not air-adjustable) vary greatly to the extent that they offer different features and sell at different prices.  An accounting of profits under the Lanham Act is intended to award profits on sales that are attributable to infringing conduct.  *See Lindy Pen Co. Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), *superseded by statute on other grounds,* Trademark Amendments Act of 1999, Pub. L. No. 106-43, 113 Stat. 218) ("[A]n accounting is intended to award profits only on sales that are attributable to the infringing conduct.").  While under a disgorgement model Plaintiff must only prove Tempur-Pedic's sales, those sales must be of the allegedly falsely advertised products.  *See, e.g.*, *Aviva Sports*, 829 F. Supp. 2d at 819.  Here, the falsely advertised products are the Tempur-Choice line of mattress products, not all of Tempur-Choice's products.[7]  Therefore, the Court excludes Kenyon's alternative "high-end" model of disgorgement damages (Appendix IX) and all related testimony.

---

[7]      Plaintiff argues that Tempur-Pedic disparaged Sleep Number products generally

(Footnote Continued on Next Page)

14

## 2.      Mattress Firm's Motion

With respect to Mattress Firm, Kenyon offers a damage calculation based on

Plaintiff's lost profits resulting from Mattress Firm's salespersons' false representations.

(Kenyon Report at 18.)  Kenyon's lost profits model is a "before and after" model,

comparing the 2012-2014 performance (average monthly mattress unit sales) of certain

Select Comfort stores located near a Mattress Firm store (Select Comfort "A Stores")[8]

with the performance of certain Select Comfort stores not located near a Mattress Firm

store, but within ten miles of another retailer selling Tempur-Pedic products.  (Select

Comfort "B Stores".)  (*Id*. at 19.)  Kenyon aggregated the monthly mattress unit sales

during the damages period in the A Stores and compared those sales to the B Stores,

based on annual averages.  (*Id*. at 20-21; Supp. Kenyon Report at Revised App. IV.)

Kenyon determined that the A Stores performed better than the B Stores in the two years

before the Court issued its injunction (the "before" period) (3.4% better in 2012 and 5.8%

better in 2013).  (*Id*.)  Using the same method, Kenyon calculated that the A Stores

---

(Footnote Continued From Previous Page)
and, therefore, any sale (Tempur-Choice or another product) made by convincing a
customer not to consider a Sleep Number bed is properly disgorged.  The Court finds that
to permit Plaintiff to recover disgorgement damages based on the sale of products that are
unrelated to the air-adjustable beds at the center of this action would result in a windfall
and would exceed any equitable consideration.

[8]     Kenyon considered a Mattress Firm store to be near a Select Comfort store if they
were in the same zip code or if they were within 10 miles and the same designated market
area ("DMA").  (Kenyon Report at 19 n.83.)  A DMA is a geographic area in which local
television viewing is measured by the Nielson Company.  (*Id*.)  Plaintiff uses DMAs as a
standardized geographic area to assist with Plaintiff's marketing expenditures and store
sales.  (*Id*.)

performed 15.2% better than the B Stores in 2014, after the Court issued its injunction (the "after" period).  (*Id.*)  Kenyon attributes the increase in the A Stores performance  in 2014 (relative to the B Stores) to the fact that Mattress Firm salespersons were no longer making the false statements about Plaintiff's products.  (Kenyon Report at 22.)  Kenyon then calculated the difference in performance in terms of annual average revenue per additional unit, and the profits on each unit, and attributed damages accordingly.  (Supp. Kenyon Report at App. V & VII; Kenyon Report at App. VI.)  Using the above model, and after considering various factors in an attempt to isolate the effect of Mattress Firm's alleged wrongful acts,[9] Kenyon opined that Plaintiff's lost profits total $19.2 million.

In the alternative, Kenyon asserts (in a footnote to his Report) that disgorgement damages are appropriate.  Applying a similar damages methodology that Kenyon used to calculate Tempur-Pedic disgorgement figures, Kenyon opined that disgorgement damages against Mattress Firm range from $1.17 million (for Tempur-Choice sales only) (Appendix VIII) to $4.9 million (for all Tempur-Pedic sales) (Appendix IX).  (Kenyon Report at 32; Supp. Kenyon Report at 4.)

### a.    Lost Profits

Mattress Firm argues that Kenyon's $19.2 million lost profits calculation and related opinions are fatally flawed.  First, Mattress Firm argues that to establish a Lanham Act false advertising claim based on the alleged false oral statements about Sleep Number beds made in-store by Mattress Firm salespersons, Plaintiff must prove that the

---

[9]     Kenyon asserts that he considered factors such as advertising trends in the DMAs, competition, store promotions, store size, and store demographics.

statements were made as part of an organized campaign of disparagement by Mattress Firm.[10]   Mattress Firm further argues that Kenyon improperly assumed that false oral statements were made systemically based solely on the proximity of the A Stores and the B Stores, not on actual evidence of any stores in which the statements were actually made.   Moreover, Mattress Firm argues that there are no facts of systemic disparagement and that Plaintiff is improperly attempting to prove systemic disparagement by using Kenyon's damages model.

Mattress Firm also argues that Kenyon failed to adequately consider several relevant market factors that could have caused Plaintiff's losses.   For example, Mattress Firm asserts that Kenyon gave "lip service to only a handful of factors potentially impacting" Plaintiff's sales and that he failed to consider significant factors as they relate to Plaintiff's competitors.   Specifically, Mattress Firm submits that Kenyon failed to control for the following:   the impact of competition on Plaintiff's sales while simply assuming it is the same for the A Stores and the B Stores; the impact of competitors' advertising and promotions on Plaintiff's sales; and, the impact of the store size of competitors.   In addition, Mattress Firm submits that Kenyon dismissed or ignored events

---

[10]      With respect to false advertising, the Lanham Act prohibits the use of false or misleading representations "in commercial advertising or promotion."   15 U.S.C. § 1125(a).   Oral statements, if "widely disseminated," are "commercial advertising" under the Lanham Act.   *See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002) ("[T]he touchstone of whether a defendant's actions may be considered 'commercial advertising or promotion' under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market.   Proof of widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement.").

that unquestionably could have caused Plaintiff to lose sales, such as other claimed harm in separate unfair competition claims against different competitors.  Moreover, to the extent that Kenyon acknowledged that any of the above impacted Plaintiff's sales, Mattress Firm submits that Kenyon improperly dismissed their impact because he wrongfully assumed that they would equally impact the A and B Stores.

"While an expert need not consider *every* possible factor to render a 'reliable' opinion, the expert still must consider *enough* factors to make his or her opinion sufficiently reliable in the eyes of the court."  *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F. 3d 1344, 1355 (Fed. Cir. 2005) (emphasis in original).  The Eighth Circuit held that an expert opinion on damages related to an antitrust claim should be excluded when the opinion fails to incorporate all aspects of the economic reality of the relevant market and fails to separate lawful from unlawful conduct.  *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056-57 (8th Cir. 2000).  Mattress Firm argues that Kenyon's model does not contain controls to separate economic effects that are the result of proper economic activity from economic effects of the false advertising.

The Court has carefully considered the parties' arguments and agrees that Kenyon's model is unreliable and, therefore, inadmissible.  To establish a Lanham Act false advertising violation based on the oral statements made by Mattress Firm salespersons, Plaintiff must establish that the statements were made as part of an organized campaign of disparagement.  *See, e.g.*, *Fashion Boutique of Short Hills, Inc.*, 314 F.3d at 57.  Plaintiff argues that Kenyon can assume such liability would be proven at trial.  In most cases, this is true.  However, here it appears that Plaintiff intends to use

18

Kenyon's damages model itself to establish liability by proving nationwide, systemic disparagement via an increase in sales in certain stores after the Court's injunction. In setting up his model, however, Kenyon did not choose the A Stores based on their proximity to Mattress Firm stores where there is actual evidence that false statements were made. Doing so would have allowed Kenyon to compare the before and after sales in locations where specific false statements were actually made. Instead, Kenyon selected the A Stores based on factors other than Mattress Firm's conduct. Therefore, Kenyon's model is not a reliable indicator of whether there has been systemic disparagement and cannot be used to demonstrate liability. The use of the "before and after" results to demonstrate liability is inappropriate because it bootstraps data from a damages model that assumes liability to prove liability. Plaintiff will not be permitted to introduce Kenyon's opinions and data, wherein he assumed liability, and then turn around and use Kenyon's data to prove liability. To the extent that Plaintiff intends to do this, the Court finds the lost profits analysis lacks foundation and is unreliable, as the analysis is based on the unsupported factual assumption that false statements were made at Mattress Firm stores located near Select Comfort A Stores.

Even assuming that Kenyon's model is not inadmissible for the above reasons, the Court finds that Kenyon's model is methodologically flawed for the additional reason that it fails to adequately account for several significant economic factors that could have explained an increase in the A Stores' sales after the Court's injunction. First, Kenyon does not adequately control for relative differences in advertising between A Stores and B Stores during the relevant time period. Specifically, he does not account for the effect

of Plaintiff's own advertising during the damages period (the "before" period) as it compares to Plaintiff's own advertising in the period after the injunction (the "after" period). Nor does Kenyon account for the fact that certain DMAs, including the Houston, Texas DMA used in his model, are considered by Plaintiff as "Aggressive Growth" markets. "Aggressive Growth" markets are markets that Plaintiff has targeted for growth and investment and Plaintiff therefore puts more resources into that market. (Kenyon Dep. at 205-06.) Despite having selected an A Store in the Houston DMA in his damages model, which was targeted for aggressive growth in 2013 and received a significant increase in advertising spending in 2014, Kenyon did not take that increased spending into account in his model. Plaintiff's own targeted increase in advertising in that market could have accounted for an increase in performance.

Second, while Kenyon acknowledges the highly competitive nature of Plaintiff's business, Kenyon's model does not adequately take into account the presence of other competitors or other local competitive effects. Kenyon asserts that there was nothing to indicate that the mix of competitors between A Store and B Store DMAs was different, but there is no evidence that Kenyon determined whether or not there were other competitors in the DMAs, whether Mattress Firm was Plaintiff's primary competitor in a particular DMA, the size or brand awareness of any other competitors in the DMAs, or any actual competition in each DMA. In addition, Kenyon did not adequately consider the impact of other competitors' advertising or promotions, or any events unrelated to Mattress Firm's conduct that could have caused Plaintiff to lose sales, other than to speculate that this conduct affected both the A Stores and the B Stores in the same way.

The Court concludes that these deficiencies in Kenyon's model undermine its reliability. Therefore, Kenyon's opinions using his lost profits model would be unhelpful to the jury and prejudicial to Mattress Firm. Accordingly, Kenyon's opinions on lost profits are properly excluded. In so holding, the Court recognizes that the jury should be allowed to hear evidence and evaluate the appropriate weight in which to afford the testimony, but Kenyon's model does not contain sufficient controls or otherwise sufficiently account for numerous material factors, including the two discussed above. These deficiencies severely undermine the foundation and reliability of Kenyon's opinions on lost profits and render his opinions on the topic inadmissible.

### b.     Disgorgement

Kenyon also calculates disgorgement damages with respect to Plaintiff's claims against Mattress Firm, applying a methodology similar to the methodology he applied to Tempur-Pedic's sales. Kenyon again offers two models, a "low-end" calculation based on the sale of Tempur-Choice mattresses only, and a "high-end" calculation based on the sale of all of Tempur-Pedic products. Using these models, Kenyon opines, respectively, that Plaintiff is entitled to damages in the range of $1.17 million and $4,238,000. (Kenyon Report at 32 n.116; Kenyon Supp. Report at 4.) For the same reasons discussed above with respect to Kenyon's disgorgement opinions relating to his "high-end" calculation of profits from sales of all Tempur-Pedic products, the Court excludes Kenyon's "high-end" calculation on Mattress Firm's disgorgement damages. However, the Court will allow Kenyon's opinions and testimony with respect to his "low-end" disgorgement calculation. Mattress Firm can challenge the weight of that opinion at trial.

### B.     Jeffery A. Stec

Stec is an economist retained by Mattress Firm to offer rebuttal opinions on

damages in this case.  Plaintiff moves to exclude portions of Stec's report.  (Patton Aff.

¶ 26, Ex. 25 ("Stec Report").)  In that report, Stec offers several opinions criticizing

Kenyon's calculation of damages based on a "before and after" analysis of lost profits.  In

addition, Stec offers his own calculation of damages.[11]  Mattress Firm argues that if any

of Kenyon's opinions are allowed to stand, Stec should be allowed to rebut them.  (Doc.

No. 332 at 3.)  As discussed above, the Court concludes that Kenyon's opinions on lost

profit damages are not admissible.  Therefore, there are no opinions on lost profits for

Stec to rebut, and Stec's opinions on lost profits damages are also properly excluded.

In his report, Stec also offers a rebuttal to Kenyon's disgorgement opinions as they

relate to Mattress Firm.  Because the Court has excluded Kenyon's "high-end"

disgorgement opinion based on the model using sales of non-Tempur-Choice products,

only the "low-end" disgorgement opinions remain for Stec to rebut (based on profits on

the sale of Tempur-Choice mattresses).  Separately, Stec offers his own calculation of

disgorgement profits.  (Stec Report ¶ 153.)

Plaintiff moves to exclude portions of Stec's report for several reasons:  Stec

improperly presents an opinion consisting largely of legal argument; Stec's opinion on

apportionment of damages is unsupported by the evidence; Stec's disgorgement analysis

(and criticism of Kenyon's disgorgement analysis) is unreliable; and Stec's inclusion of

---

[11]     Stec offers opinions on the amount of damages due under both lost profits and
disgorgement theories.

certain fixed costs in his analysis of appropriate deductions is improper.  Mattress Firm

argues that most of Plaintiff's objections to Stec's testimony go to the factual basis for

Stec's opinions and are therefore appropriately addressed on cross-examination.

Plaintiff first takes issue with the content of the first thirty-five pages of Stec's

report, much of which consists of a summary of Kenyon's calculation of Mattress Firms'

profits and disgorgement theory.  Plaintiff maintains that this section consists largely of

legal conclusions and argument, specifically Stec's assertion that Kenyon's analysis is

incomplete insofar as he made no attempt to apportion profits.  In addition, Plaintiff

asserts that Stec inappropriately weighs evidence and assesses witness credibility in

stating his opinions.

The Court agrees with the general proposition that expert witnesses are not

permitted to offer testimony on legal matters or legal conclusions.  *See S. Pine*

*Helicopters*, *Inc. v. Phoenix Aviation Managers, Inc.*, 320 F. 3d 838, 841 (8th Cir. 2003);

*Cattanach v. Burlington N. Santa Fe, LLC*, Civ. No. 13-1664, 2015 WL 5521751, at *9

(D. Minn. Sept. 18, 2015).  However, Mattress Firm maintains that Stec does not purport

to opine on the legal issue of the burden of proof.  Therefore, Stec will be allowed to

testify on his own apportionment analysis and rebut Kenyon's analysis without offering

legal conclusions or statements of the law.  Of course, if at trial Stec's testimony should

venture into legal analysis (including any statements characterizing Kenyon's analysis as

"incomplete" in terms of its legal burden), the Court will entertain an appropriate

objection.  Similarly, the Court will entertain motions at trial should Stec's testimony

inappropriately intrude on the jury's function of assessing the credibility of witnesses. Stec's opinions on apportionment are presumptively admissible.

Plaintiff also argues that Stec's apportionment analysis lacks any factual basis and cannot carry Defendants' burden of demonstrating apportionment.  As noted above, under the disgorgement model, a plaintiff need only show a defendant's sales; then to establish that a disgorgement calculation should be reduced on an apportionment theory, the defendant must prove elements of cost or deduction.  *See Aviva Sports, Inc.*, 829 F. Supp. 2d at 818-19.  Plaintiff asserts that Kenyon's disgorgement analysis is specifically predicated on the percentage of consumers who find the advertising at issue to be material as determined by Poret's survey (discussed below), and therefore that individuals who purchased for reasons other than the offending advertising have already been excluded from the calculation.  (*Id.*)  The Court concludes that Plaintiff's arguments with respect to Stec's opinions on apportionment all go to the weight of the opinions and not to their admissibility.  As such, Stec's opinions on this matter can be challenged on cross-examination.  Similarly, Plaintiff can challenge on cross-examination the factual basis for Stec's opinions with respect to certain deductions from revenues that Plaintiff claims are inappropriate.

Plaintiff also argues that Stec's disgorgement analysis and criticism of Kenyon's analysis are inadmissible.  Plaintiff argues that Stec's disgorgement model is limited to Mattress Firm stores to which tear-pads (each containing fifty Flyers) were shipped, and therefore the model impermissibly fails to account for the fact that salespeople were trained to make false statements about Plaintiff even without the Flyers.  Mattress Firm

disputes that Stec's disgorgement model is so limited, arguing that he, in fact, relied on evidence to determine sales that were even arguably attributable to the Flyer, whether or not the Flyer was actually used.  In addition, Mattress Firm maintains that it is entirely proper for Stec to criticize Kenyon for assuming that all purchasers would have been exposed to the false advertising.  All of these disputes are appropriate areas for cross-examination, but do not justify exclusion.

Finally, Plaintiff argues that in his deduction analysis, Stec inappropriately includes fixed or indirect costs, such as "store occupancy cost," "store operating" costs, "market overhead," "warehouse occupancy," and "warehouse operating" costs.  (Stec Report at 4.4.)  The Court declines to rule on whether these costs are appropriately deducted, at this time.  The Court reminds the parties that principles of equity come into play with respect to the calculation of any disgorgement damages.  As such, should the issue of disgorgement damages remain for resolution after trial, then the Court will consider arguments as to what, if any, costs can be deducted.

### C.     Kristopher A. Boushie

Boushie is a rebuttal damages expert whom Tempur-Pedic retained to review discovery and to review and comment on Kenyon's (and any other expert's) reports on damage-related issues.  (*See* Patton Aff. ¶ 14, Ex. 13 ("Boushie Report") at 2.)  For the purposes of his report, Boushie assumed that the statements regarding Sleep Number M-Series mattresses containing "commodity foam" and the images showing "hammocking" that were distributed to retailers in the form of tear-sheets will be found to be disparaging and that liability will be found against Tempur-Pedic.  (*Id*.)  In his report,

Boushie critiques Kenyon's disgorgement models, and presents an alternative damages model based on the potential remedy of corrective advertising. (*Id*. at 4-5.)

Plaintiff does not challenge Boushie's qualifications, but instead argues that his opinions are inadmissible and should be excluded for several reasons. In particular, Plaintiff argues that: (1) Boushie should not be allowed to opine that disgorgement is not an appropriate remedy because that is a legal opinion; (2) Boushie's opinions are unreliable because he incorrectly assumes that the allegedly false claims were only disseminated by the written tear-sheet when, in fact, they were also disseminated orally by salespersons; (3) Boushie's "corrective advertising" remedy is premised on assumptions that make that remedy incapable of addressing any harm; and (4) Boushie's opinions regarding the deduction of several cost categories with respect to his disgorgement damages model lack factual support.

First, Plaintiff argues that Boushie's report constitutes an improper legal opinion. Plaintiff points to portions of Boushie's report stating that the proper remedy in this case is corrective advertising, not disgorgement. (Boushie Report ¶¶ 10, 44, 54.) Plaintiff argues that this opinion constitutes an inadmissible legal conclusion, and that the appropriate remedy is a determination for the Court or the jury. On this point, Tempur-Pedic counters that Plaintiff has mischaracterized Boushie's opinions and submits that Boushie does not provide opinions on pure issues of law. Specifically, Tempur-Pedic maintains that Boushie does not offer any instruction concerning the potential measures of damages generally available in false advertising cases, and that neither Boushie nor Tempur-Pedic presume to instruct the jury on the law. Tempur-Pedic

also represents that Boushie does not intend to testify at trial that disgorgement of profits is legally unavailable to Plaintiff.  Instead, Boushie intends to testify that there is no evidence showing either that Tempur-Pedic received any benefit from the alleged false advertising or that Plaintiff lost any sales.  In Section VII of his Rebuttal Report, Boushie explains that corrective advertising is more appropriate than disgorgement considering this asserted absence of evidence of harm.  Tempur-Pedic argues that this opinion is no different than Kenyon's opinion that disgorgement is an appropriate remedy by selecting that type of remedy in his report.  Finally, Tempur-Pedic argues that to the extent that Plaintiff has concerns about Boushie offering an impermissible legal opinion at trial, that concern would appropriately be raised in a motion *in limine*.

The Court is satisfied that Boushie does not intend to offer any legal opinion on the proper measure of damages, and instead that Tempur-Pedic's counsel will properly present legal argument to the Court as to its interpretation of the law regarding the available remedies.  At this time, the Court declines to exclude Boushie's opinions, as it appears that he can offer testimony without improperly offering legal opinions.  However, should Boushie attempt to offer improper legal opinions at trial, the Court will entertain appropriate objections.

Plaintiff also argues that Boushie's opinion on the proper measure of damages is inconsistent with the law and outside the scope of his expertise.  This argument relates to Boushie's conclusion that he saw no evidence that the challenged advertising comparisons caused Plaintiff any economic injury.  Boushie bases this conclusion on evidence that the introduction of the Tempur-Choice mattress as a whole had no impact

on Plaintiff's business and, therefore, neither could the alleged disparaging comparisons. (Boushie Report ¶¶ 30-36.)  Plaintiff objects to the inclusion of this opinion because Plaintiff maintains that to obtain disgorgement of profits as a remedy, a plaintiff need not prove actual monetary harm or actual monetary benefit.  Tempur-Pedic, however, argues that Boushie does not opine (or intend to testify) that disgorgement is legally unavailable to Plaintiff, but rather that he offers his opinions to correct Kenyon's disgorgement models and to propose reducing Kenyon's disgorgement figure based on his corrections. Tempur-Pedic argues that Boushie suggests that, based on the facts and circumstances of the case, corrective advertising would be a more reasonable remedy, and supports his opinions with evidence that there is no evidence of unjust enrichment or damages.

The Court again concludes that Boushie will be presumptively permitted to testify about the impact of the alleged false statements on Plaintiff in his critique of Kenyon's disgorgement analysis and his own corrective advertising calculations, and in particular his opinion that corrective advertising could remedy the harm.  To the extent that Plaintiff argues that Boushie's disgorgement and corrective advertising calculations are based on erroneous assumptions (and in particular because his analyses ignore the significant dissemination of the false claims), it can challenge the assumptions and calculations on cross-examination.  Similarly, with respect to Boushie's corrective advertising opinion, Plaintiff argues that the model is based on the false premise that the distribution of false statements was limited to the distribution of the tear-sheets.  Again, this critique goes to the weight of Boushie's opinion, and Plaintiff can cross-examine Boushie on this point.

Finally, Plaintiff argues that Boushie's cost calculations are not based in fact and are impermissibly speculative.  In particular, Plaintiff argues that Boushie lacks required support for several categories of costs that he opines should be deducted from Kenyon's disgorgement calculation, such as sales and marketing expenses, research and development expenses, and administrative costs.  This argument is similar to the one made with respect to Stec's testimony, and the Court declines again to decide whether these costs are appropriately deducted.  Considering the equitable principles involved, should the issue of disgorgement damages remain to be resolved after trial, the Court will consider arguments as to what, if any, costs can be deducted.

## III.   Marketing Experts

On March 6, 2015, Plaintiff disclosed Hal Poret ("Poret") as a consumer survey expert, and Erich Joachimsthaler ("Joachimsthaler") as a branding expert.  On April 17, 2015, Defendants disclosed David Stewart ("Stewart") as a marketing expert.

### A.   Hal Poret

Defendants jointly move and Mattress Firm moves separately to exclude the Poret Report.  Poret is a consumer survey expert whom Plaintiff retained to conduct a survey to determine:

> 1) the extent to which certain statements made by Mattress Firms' sales representatives regarding Sleep Number beds would be material to consumers' decisions regarding whether to purchase a Sleep Number bed; and 2) with regard to the Tempur-Pedic advertising: a) what do consumers perceive the term "Commodity Memory Foam" to mean in reference to Sleep Number beds; b) how do consumers understand the section of the advertisement showing an image of a person sleeping on a sagging mattress with a curved spine, along with the claim that the Tempur-Choice mattress

> virtually eliminates hammocking; and c) the extent to which these claims
> would be material to consumers' purchasing decisions.

(*See* Doc. No. 288 ("Wright Decl.") ¶ 2, Ex. 1 ("Poret Report") at 5.)  Poret holds

bachelor's and master's degrees in mathematics and a J.D. from Harvard Law School.

(*Id.* at 77.)  He has designed, supervised, and analyzed more than 700 consumer surveys,

including surveys on trademark and advertising perception.  (*Id.*)[12]  In this action, Poret

designed a study involving 600 respondents among adjustable air and adjustable

air/memory foam mattresses consumers.  (*Id.* at 8.)  The participants were divided into

two groups:  (1) the Sales Statements survey group—respondents were questioned to test

the materiality of three statements Mattress Firm sales representatives made with regard

to Sleep Number beds; and (2) the Flyer survey group—respondents were shown the

Flyer and asked a series of questions about their perception of the Flyer.  (*Id.* at 8.)  As to

the Flyer group, the respondents were split into a 200-person Test Group and a

200-person Control Group.  (*Id.*)

With respect to the Flyer survey group, the respondents were instructed to imagine

that they were interested in purchasing an adjustable air bed and then shown the

following version of the Flyer:

---

[12]     Defendants do not challenge Poret's qualifications.



(Poret Report at 14.)  They were then asked a series of questions regarding what they

understood the Flyer to communicate, such as whether they noticed that the ad compared

Tempur-Choice and Sleep Number beds.  (*Id*. at 16.)  Those who answered "no" or

"don't know" did not continue with the survey.  (*Id*.)  Those who answered "yes" were

then asked to describe various comparisons in an open-ended format.  (*Id*. at 17.)  Next,

they were asked questions focused on specific sections of the ads, such as "commodity

memory foam" phrase and the "hammocking" imagery.  (*Id*. at 17.)  Respondents were

then shown the Flyer and asked about specific parts, with the specific parts marked with a

red box.  (*Id*. at 18.) For example, Poret asked:

> What, if anything, does this phrase (with a red box around it) communicate
> to you about SLEEP NUMBER beds?  (*Id*. at 18.)

31

Which of the following most accurately describes what this phrase (with the red box around it) communicates to you about SLEEP NUMBER bed. (*Id*. at 19.)

[If respondents answered that the phrase communicates something negative:]

What makes you feel that this phrase (with the red box around it) communicates something <u>negative</u> about SLEEP NUMBER beds?

How, if at all, would this statement (with the red box around it) regarding SLEEP NUMBER beds impact your likelihood of purchasing a SLEEP NUMBER bed?  (*Id*. at 20.)

[If respondents answered that the phrase communicates something positive:]

What makes you feel that this phrase (with the red box around it) communicates something <u>positive</u> about SLEEP NUMBER beds?  (*Id*. at 20.)

Similarly, Poret asked the following questions regarding the "hammocking" imagery.

What, if anything, does the section (with a red box around it) communicate to you about SLEEP NUMBER beds?  (*Id*. at 22.)

Which of the following most accurately describes that this section (with the red box around it) communicates to you about SLEEP NUMBER bed.  (*Id*. at 23.)

[If respondents answered that the phrase communicates something negative:]

What does this section (with the red box around it) communicate to you about SLEEP NUMBER beds that is <u>negative</u>?

Which of the following, if any, does this section (with the red box around it) communicate to you about SLEEP NUMBER beds? (*Id*.)

How, if at all, would this section (with the red box around it) regarding SLEEP NUMBER beds impact your likelihood of purchasing a SLEEP NUMBER bed?  (*Id*. at 24.)

[If respondents answered that the phrase communicates something positive:]

What does this section (with the red box around it) communicate to you about SLEEP NUMBER beds that is <u>positive</u>?  (*Id*. at 25.)

The Control Group was shown a flyer that was identical in all respects except that it did not contain the imagery or the commodity foam language.  (Poret Report at 26-29.)  The control group was asked the same questions.  (*Id*. at n.6-n.7.)

Based on the survey results, Poret concluded, among other things, that, with respect to the closed-ended question, 44% of the Test Group respondents understood the phrase "commodity foam" to communicate something negative, and 31% of the Test Group respondents answered that the phrase "commodity" memory foam would make them less likely to purchase a Sleep Number bed.  (*Id*. at 30-31.)  With respect to "hammocking," Poret concluded that, in the closed-ended question, 27.5% of the Test Group respondents answered that that Sleep Number beds allow hammocking, and 55% answered that this section of the ad would negatively impact their likelihood of purchasing a Sleep Number bed.  (*Id*.)  In his report, Poret also stated his opinion that the phrase "commodity" memory foam and the "hammocking" comparisons falsely communicates, respectively, that Sleep Number foam is lower quality and that Sleep Number beds suffer from hammocking problems and that these communications would be material to consumers' purchasing decisions.  (*Id*. at 30-32.)

Poret also conducted a Sales Statement survey, testing three statements related to the Sleep Number bed Mattress Firm sales associates allegedly made.  (*Id*. at 8, 11-14.)

For this survey, Poret surveyed 200 respondents by showing them a list of statements relating to Sleep Number beds and asking them a series of questions regarding the extent to which, if at all, a statement would influence their decision to buy a Sleep Number bed. (*Id.*) Included were the three statements (the "Test Statements") at issue in this lawsuit, specifically that:  (1) the store stopped selling Sleep Number beds because too many customers returned them; (2) the store stopped selling Sleep Number beds because too many customers had problems with them; and (3) Sleep Number beds develop mold.  (*Id.* at 10.)  Poret also asked about additional statements aimed at being "control statements." (*Id.*)

Based on the survey results, Poret concluded that the Test Statements were "highly material to consumers' decisions" because "[h]igh percentages of respondents answered that the [Test Statements] would influence their decisions."  (*Id.* at 30.)  Poret noted that respondents also selected the Control Statements to varying degrees, but reasoned that he could address the "noise" from these statements by subtracting the average rate of the selections (14%) from the percentages of the Test Statement selections.  (*Id.*)  Poret also reasoned that the results would still "strongly indicate" that the statements or substantially similar statements are material.  (*Id.*)

### 1.    Defendants' Joint Motion

Under the Lanham Act, a plaintiff must prove that a false or misleading description is likely to influence the consumer's purchasing decision.  *3M Innovative Prop. Co.*, 361 F. Supp. 2d at 971; *Aviva Sports, Inc.*, 829 F. Supp. 2d at 822.

As an initial matter, Defendants argue that Poret improperly offered conclusions in his report about the alleged falsity of the challenged claims in the Flyer.  Defendants point to Poret's opinion that, based on the results of the survey, the phrase "commodity memory foam falsely and misleadingly communicates to a substantial percentage of consumers that Sleep Number foam is generic and/or lower quality foam and that this would be material to purchase decisions."  (Poret Report at 31-32.)  Plaintiff disputes this and contends that Poret has not asserted any opinion as to the truth or falsity of any of the claims he asserted and that he confirmed as much in his deposition.  (Poret Report at 5; Patton Aff. ¶ 75, Ex. 74 ("Poret Dep.") at 46-48.)  Instead, Plaintiff submits that Poret's survey tests the materiality and meaning of statements Plaintiff has alleged are false and misleading, and in particular whether certain statements, if found to be false and misleading, convey a particular message that is material or important to consumers. Plaintiff also represents that Poret will not testify at trial as to the truth or falsity of the statements at issue.

Because Plaintiff has represented that Poret will not testify as to the truth or falsity of the statements at issue, Defendants' motion on this point is moot.  Defendants are correct that experts are not permitted to offer legal conclusions.  The Court finds that Poret's testimony is presumptively admissible assuming proper foundation is laid. However, should Poret attempt to testify as to the truth or falsity of the challenged statements, the Court will entertain appropriate objections at trial.

Defendants also argue that Poret's survey failed to satisfy fundamental principles of survey research in that:  (1) the survey did not sample the appropriate universe; (2) the

35

survey did not replicate actual market conditions; (3) the questions were biased and leading; (4) the data gathered was not accurately reported and analyzed in accordance with accepted statistical principles; and (5) the survey failed to account for other variables that influence consumer purchasing decisions.

First, Poret's sample population was defined as any individual who purchased any memory foam or adjustable air/memory foam mattress in the past two years, or who planned to purchase any memory foam or adjustable air/memory foam mattress in the next two years. (Poret Report at 33, 35.) Defendants submit that this population is over-inclusive, mainly because Poret did not limit his sample population to those who purchased or planned to purchase mattresses within the same price range as the Sleep Number M-Series and Tempur-Choice beds. In addition, Defendants submit that Poret's population is further compromised because he failed to control for numerous material facts, such as those who currently own or have owned a Sleep Number or Tempur-Pedic mattress.

Second, Defendants assert that Poret's survey lacks probative value because it did not approximate actual market conditions. Defendants argue that the Flyer survey did not analyze the product comparisons in the context that consumers would have encountered them in the marketplace. Defendants point out that Poret exposed all respondents to all of the claims included in the survey despite the fact that consumers in the actual marketplace were never exposed to these claims. Poret then included only those respondents who "paid attention to the ad and understood." Based on this, Defendants submit that the survey results (even if valid) cannot be extrapolated beyond the subset of

36

consumers who were exposed to, paid attention to, and understood the claims. Finally, Defendants take issue with the fact that Poret circled the challenged claims with red boxes, claiming that this amounted to a manipulation of the challenged advertising claims because it removes them from their context and portrays them inaccurately and because the use of the red marking encourages a negative connotation.

Third, Defendants argue that the questions in the survey were leading and ambiguous because participants were asked whether the claims were "negative" without defining "positive" and "negative," the questions focused on Sleep Number without reference to the Tempur-Choice product, and Poret did not define other key terms in the survey.

Fourth, Defendants submit that the survey data was not gathered and reported accurately. For example, Defendants submit that Poret offered his own subjective interpretations of the respondents' open-ended answers, and that he classified the responses arbitrarily.

Finally, Defendants argue that Poret's methodology failed to account for other variables, such as price, comfort, and mattress features, not considered in the survey, that could affect consumer decisions, or to account for how the Flyer would influence purchasing decisions.

The Court concludes that none of Defendants' criticisms warrant the exclusion of Poret's survey. First, Poret's survey population is limited to individuals interested in the beds at issue in this litigation (adjustable air beds and adjustable air/memory foam beds), and it did not include individuals interested in any mattress (such as mattresses being sold

at very different price points).  In addition, Poret had a Control Group to control for other factors, such as pre-existing beliefs related to the beds at issue in this action.  Second, Poret's use of the Flyer before asking questions in his survey sufficiently approximated the market conditions in which a consumer would have seen it if shopping at a Tempur-Pedic retailer.  Third, Poret's use of the red box to isolate portions of the survey does not render the survey inadmissible.  Poret showed the Test Group the Flyer twice before isolating portions so as to ask specific questions, and Poret used the red box in both the Test Group and the Control Group.  Fourth, the Court does not find Poret's questions to the Test Group to be leading or ambiguous, and the use of the Control Group would have reflected any impact of the use of the word "negative" on the test responses. Finally, the Court discerns no indication that the survey data was gathered and reported inaccurately.

The Court concludes that Defendants' criticisms of Poret's Survey all go to the weight of the survey, not its admissibility.  In addition, the survey was conducted using sound methodology, and the survey's results, and Poret's opinions based on those results, are admissible.  Defendants' objections to Poret's methodology are precisely the type appropriately raised via cross-examination.

### 2.    Mattress Firm's Motion

Mattress Firm separately challenges the Poret Report as it relates to the Sales Statement survey.  Poret's Report purports to measure the materiality of the three Test Statements that Mattress Firm salespersons allegedly disseminated to customers. Mattress Firm submits that the survey should be excluded because it is irrelevant to

materiality and has no value for the jury or, at a minimum, because any probative value is outweighed by prejudice.

Specifically, Mattress Firm argues that the survey does not test the actual statements made by Mattress Firm salespersons. Mattress Firm points out that Plaintiff's counsel provided Poret with the Test Statements used in the survey and that Poret himself did not review evidence about Mattress Firm's salespersons' allegedly false statements. In addition, Mattress Firm argues that the Test Statements do not reflect the vast majority of the alleged statements in the record.[13] Further, Mattress Firm argues that Poret has no reliable basis for his opinion that the survey results pertain to the materiality of "substantially similar" statements to the Test Statements. In particular, Mattress Firm contends that Poret never analyzed or tested the similarity of the Test Statements used in his survey to the evidence of statements actually made. Mattress Firm argues that Poret, therefore, should not be allowed to offer any opinions as to the similarity of any statements, or as to the materiality of any statements that he deems similar to the Test Statements.

As an initial matter, Mattress Firm's contention that Poret did not review the evidence on the Test Statements himself and that the Test Statements are not identical to those made by the Mattress Firm salespersons does not render the resulting opinions unreliable. Poret reasonably assumed liability and was tasked with measuring whether

---

[13]     For example, according to Mattress Firm, the "develop mold" Test Statement is attributed to only five employees and fails to account for dissimilarities among the actual statements.

the Test Statements would be material.  The issue of whether the statements were, in fact, made and sufficiently disseminated is a liability issue.  The Court discerns no reason for Poret to test every iteration of the allegedly false and misleading statements in order to render a reliable survey.  Instead, Mattress Firm can question Poret about his choice of test statements and a jury can decide how much, if any, weight to afford the survey based on that, and other factors.

Mattress Firm further submits that the Sales Statement Survey uses additional methodology that is flawed and unreliable.  Mattress Firm asserts that the survey has numerous methodological flaws, such as the use of inapposite questions, failure to account for preexisting impressions about Sleep Number beds, the use of ambiguous test statements, the failure to measure likely influence on purchase decisions in real world marketplace, and the use of inappropriate weighting techniques.

Similar to the critiques discussed above with respect to Defendants' joint motion to exclude Poret's Survey, the Court concludes that Mattress Firm's criticisms of Poret's methodology go to the weight of the survey, not its admissibility.  Thus, they do not support the exclusion of Poret's opinions or survey results.  Instead, Mattress Firm can raise these criticisms on cross-examination.

### B.   Erich Joachimsthaler

Joachimsthaler is founder and Chief Executive Officer of Vivaldi Partners Group, a strategic consulting firm with a focus on strategy, marketing, and innovation.  (Doc. No. 310 ("Weltman Decl.") ¶ 3, Ex. 2 ("Joachimsthaler Report") ¶ 1.)  Joachimsthaler worked in the brand and marketing field for more than twenty years.  (*Id.*)

Joachimsthaler has an economics degree from the University of Applied Sciences,

Giessen-Friedberg, Germany, and a Ph.D. in business administration from the University

of Kansas; he completed a post-doctoral fellowship at the Harvard Business School; and

he has been a member of the American Marketing Association for 25 years.  (*Id.* ¶ 5.)

Plaintiff retained Joachimsthaler to offer opinions on the Sleep Number brand and

Plaintiff's business, and specifically to provide an opinion on the issue of whether false

advertising by Defendants has likely damaged the Sleep Number brand.  (*Id.* ¶ 9.)

As relevant to this motion, Joachimsthaler provides the following opinions in his

report:  (1) "The nature of the mattress industry presents a situation where competitive

position, pricing strategies and market reach make Select Comfort and Sleep Number

brand particularly susceptible to action such as false advertising from Tempur-Pedic and

Mattress Firm"; (2) "Sales representatives play a prominent role in the decision-making

process in the store and can cause consumers to alter their purchase decision via negative

comments about a brand"; and (3) Plaintiff's increased sales in 2012 appear to be less

than expected given its increase in brand awareness.  (Joachimsthaler Report ¶¶ 12, 64.)

Defendants seek to exclude Joachimsthaler's testimony, arguing that his opinions

are not based on accepted or reliable methodology or evidentiary foundation and,

therefore, are irrelevant, moot, prejudicial, and misleading.  In addition, Defendants argue

that Joachimsthaler's opinions are inadmissible because they lack adequate factual

foundation, are unduly speculative, and contain methodological defects.

Defendants argue that Joachimsthaler's competitive analysis of the mattress

industry, and particularly his opinion that Plaintiff is "particularly susceptible" to false

advertising from Mattress Firm and Tempur-Pedic, is speculative, unscientific, and actually contrary to evidence that there are several relevant competitors outside of Mattress Firm and Tempur-Pedic, and that customers visiting Mattress Firm stores are the least likely to consider a Sleep Number bed.  In addition, Defendants submit that Joachimsthaler has little experience in the mattress industry and has no basis on which to conclude that sales representatives play a prominent role in a consumer's decisionmaking process, and that his opinion on how consumers might react to negative comments on a brand cannot stand absent survey evidence.  Finally, Defendants submit that Joachimsthaler's opinion that Plaintiff's sales were less than would be expected in 2012 is inadmissible speculation because he assumes a direct correlation between awareness and sales and offers no evidence of a link between Defendants' allegedly false statements and Plaintiff's 2012 unaided brand awareness and sales numbers.

Plaintiff submits that Joachimsthaler provides a well-supported, well-reasoned, and admissible conclusion regarding the susceptibility of Plaintiff's sales to Defendants' false advertising.  Plaintiff asserts that Joachimsthaler analyzed the competition in the specialty marketplace and presented evidence of the directly competitive relationship between the Tempur-Pedic and Sleep Number brands across reputation, brand loyalty, and pricing strategy and noted research on the market reach of Mattress Firm and Tempur-Pedic.  (*Id.* ¶¶ 16-22, 23.)  Plaintiff contends that Joachimsthaler appropriately based his opinions on his experience, expertise, and knowledge of brand and consumer behavior, and that he supported his opinions with evidence, in the form of consumer surveys or published pricing information.  Plaintiff asserts that Defendants' criticisms of

Joachimsthaler's analysis lack merit, and in challenging Joachimsthaler's testimony,

Defendants mischaracterize Joachimsthaler's deposition testimony and documents  on

which he relied, and that Defendants' arguments do not provide a basis upon which to

exclude Joachimsthaler's opinion as it applies to Mattress Firm.  In particular, Plaintiff

argues that Joachimsthaler's opinion as to the market reach of Mattress Firm and its

ability to influence consumer behavior (along with Mattress Firm's sale of Tempur-Pedic

products) in connection with his opinion that Plaintiff is vulnerable to false advertising is

well-grounded and that Defendants' attempt to exclude it by challenging the significance

of the percentage of purchasers from Mattress Firms stores who also considered the Sleep

Number brand at most goes to the weight of Joachimsthaler's opinion.

Plaintiff also submits that Joachimsthaler's analysis supporting his conclusion

regarding the importance of the role of salespeople in consumer decisions to buy

mattresses is based on facts and established principles of consumer behavior.  Plaintiff

points out that Joachimsthaler:  (1) explained the stages of consumer decisionmaking and

identified factors within the specialty mattress market that demonstrate the importance of

sales personnel; (2) analyzed consumer purchasing of specialty mattresses; and

(3) supported his discussion of the role of salespeople with publications in the field.  (*Id*.

at ¶¶ 28-41.)  Plaintiff maintains that Joachimsthaler's report is supported by numerous

authorities, reports, retail environment studies, published research, and empirical data.

Plaintiff further submits that Joachimsthaler's opinion regarding the expected

impact of the alleged false advertising on consumers is admissible, as he is providing an

opinion that Defendant's false advertisements actually could and likely did accomplish

their purpose of influencing consumer behavior.  Finally, Plaintiff maintains that

Joachimsthaler's opinion regarding the damage to the Sleep Number brand is based on

evidence in the record (such as published literature, empirical studies, and models) and a

sound analysis of that evidence showing that brand awareness influences sales.

The Court finds that Joachimsthaler's expertise in the area of marketing and brand

strategy will assist the jury in understanding the evidence in this case, and that

Joachimsthaler is qualified to offer an opinion on the above issues.  The Court also finds

that Joachimsthaler's testimony is based on sufficient facts and that Joachimsthaler used

sufficiently reliable methods in arriving at his opinions.  Defendants' challenges to the

reliability and relevancy of Joachimsthaler's testimony go to weight, not admissibility,

and therefore are appropriately addressed via cross-examination and the presentation of

Defendants' own evidence.  Accordingly, Defendants' joint motion to exclude

Joachimsthaler's testimony is denied.

### C.    David Stewart

Stewart is an expert witness for Defendants.  Stewart is the Presidential Chair of

Marketing and Law at Loyola Marymount University, College of Business

Administration.  (Patton Aff. ¶ 28, Ex. 27 ("Stewart Report").)  Stewart has a Ph.D. in

Psychology from Baylor University, and has extensive experience in marketing and

consumer behavior, which includes the implementation of consumer surveys and the

publication of numerous papers.

Plaintiff does not challenge Stewart's qualifications.  Instead, Plaintiff seeks to

exclude certain opinions in his expert report.  In particular, Plaintiff argues that:  Stewart

reaches improper legal conclusions on the ultimate issue of false advertising and

improperly opines on the admissibility of another expert report; certain of Stewart's

opinions lack a sufficient basis and do not adhere to admissibility requirements (such as

evidence obtained through secret shoppers, the incentives of retail salespersons, the

impact of negative information available on the Internet, and the way in which to

measure the impact of the false statements at issue); and that Section A of Stewart's

expert report should be excluded because the opinions stated therein do not constitute

proper rebuttal.

The Court first addresses Section A of Stewart's report. Plaintiff submits that this

section should be excluded because it does not consist of a rebuttal opinion.[14] But,

Section A consists of broad concepts that provide background material for Stewart's

Report. Thus, Section A is presumptively admissible.

Next, Plaintiff argues that Stewart improperly asserts a number of opinions related

to the legality of Defendants' advertising, including: (1) that it is not misleading "for a

sales person to answer a direct question about why his or her firm does not carry a

---

[14]     The issue of whether Section A consists of proper rebuttal is properly before the
Court. Plaintiff previously moved to strike Section A of Stewart's Report as untimely
because it did not rebut any expert opinions disclosed by Plaintiff. (Doc. Nos. 200, 230.)
Magistrate Judge Rau denied Plaintiff's motion and held that the disclosure was timely to
the extent that it rebutted Plaintiff's experts' opinions, but also specifically noted that he
declined to analyze the content of the expert reports and deferred determination of
admissibility at trial. (Doc. No. 249 at 7-8 ("[The] Court notes that its analysis is limited
only to the characterization of these expert reports as rebuttal for the purposes of
compliance with the scheduling order; any argument about the admissibility of the expert
reports is within the discretion of the Honorable Donovan W. Frank as the trial judge.").
The Court affirmed. (Doc. No. 260.) The Court concludes that it is now appropriate to
reach the issue of whether the content of the report is admissible.

product, such as the Sleep Number bed, by referring to their own personal prior experience or to what they may have heard from others" (Stewart Report at 16); (2) that the advertising statements at issue are lawful for various reasons (lawful comparative advertising and/or puffery); and (3) that the distribution of the Flyer "does not constitute broad dissemination" (*id*. at 8, 15). Plaintiff argues that these opinions are all legal conclusions that are improper testimony for an expert.

Defendants argue that Stewart does not offer improper legal opinions and that Plaintiff has mischaracterized the excerpted quotes on which Plaintiff relies. Specifically, Defendants maintain that Stewart does not discuss the Lanham Act specifically or express any opinion on when an advertisement may or may not be false under that statute. Defendants point out Stewart actually opined that Poret's survey does not test statements that are representative of those alleged in the Amended Complaint. Defendants further maintain that Stewart's opinions concerning the general practice of comparative advertising based on his experience is not impermissible, as it provides background for his criticisms of Poret's survey methodology.

Having carefully reviewed the parties' submissions and considered the arguments, the Court concludes that Stewarts' opinions are presumptively admissible provided proper foundation is laid. The Court again notes, however, that experts are not permitted to offer legal opinions or otherwise provide legal analysis. At trial, should Stewart's testimony veer into the territory of improper legal opinion, the Court will entertain an appropriate objection.

In addition, at several points in his report, Stewart offers opinions on Poret's survey, asserting that the survey fails to meet certain requirements set forth in the Manual for Complex Litigation ("Manual").  Plaintiff seeks to exclude these opinions because the Manual is generally regarded as laying out admissibility standards and it would be improper for an expert to opine on whether Poret's survey meets the standard. Defendants argue that courts routinely allow survey experts and rebuttal experts to use and refer to the Manual as a touchstone to support their opinions regarding survey methodologies and practice.  *See, e.g.*, *Active Sports Lifestyle USA LLC v. Old Navy, LLC*, Civ. No. 12-572, 2013 WL 11239385, at *13, 16 (C.D. Cal. Nov. 21, 2013). Defendants also argue that it is not off limits for an expert to address the Manual's "admissibility standard" and maintains that it is appropriate for Stewart to offer opinions as to whether Poret's survey meets the requirements set forth in the Manual.  Again, the Court finds that Stewart's testimony will assist a jury in understanding and weighing Poret's survey evidence.  The Court finds that Stewart's testimony on this point is presumptively admissible assuming proper foundation is laid.  And again, should Stewart's testimony veer into legal opinions, the Court will entertain appropriate objections.

Finally, Plaintiff argues that certain of Stewart's opinions are speculative and lack a sufficient basis.  First, Plaintiff asserts that Stewart's opinions regarding evidence of false advertising that Plaintiff gathered using secret shoppers (individuals who visited retails stores posing as customers) lack any factual basis.  Second, Plaintiff argues that Stewart's opinion regarding the "incentives" a salesperson receives for the sale of a

mattress similarly lacks any factual basis.  Third, Plaintiff argues that Stewart's opinion regarding information on the Internet—namely the implication that the statements at issue are true because negative reviews and complaints appear on the Internet—must be excluded because it is a legal opinion as to the ultimate truth of a statement.  In this vein, Plaintiff argues that Stewart should not be allowed to perform the duty of the jury and weigh evidence and that Stewart provides no support for his claim that if something is available on the Internet, it is true.  Fourth, Plaintiff takes issue with Stewart's opinions insofar as he attempts to assign points to different factors that may influence a consumer's decision (such as price, comfort, brand, etc.), as well as with his critiques of Poret's analysis for not considering all of the factors that Stewart considered.  Finally, Plaintiff argues that Stewart's opinion that Poret's survey did not reflect market realities with respect to the "commodity foam" statement lacks basis and relies on speculative assumptions.

Defendants respond that Plaintiff ignores substantial evidence Stewart referenced in his report.  For example, Defendants submit that Stewart:  cited evidence about the context in which alleged statements were made to secret shoppers; considered evidence, including testimony of more than 20 salespeople, on how Mattress Firm's salespeople interact with real customers; based his discussion of salesperson and consumer behavior on relevant literature and his expertise in the field; cited testimony of Mattress Firms' salespeople about how they focus on selling their own products, respond to consumer questions about competitors, and the training they received; and considered evidence in the context of scholarly literature on consumer behavior and perception.  Moreover,

Defendants contend that Stewart's use of a point allocation example was a hypothetical exercise used to demonstrate how the addition of other factors (such as price, comfort, brand, etc.) would affect Poret's analysis.  Defendants argue that the hypothetical exercise is not being offered to negate the materiality of the challenged statements, but instead the exercise was intended to point out that a point allocation question could change materially if product information is included for the consumer's consideration. Defendants also argue that the equation Stewart used properly illustrates the limited significance of Poret's survey results with respect to the commodity foam statement. Finally, with respect to Stewart's opinion regarding Internet complaints, Defendants contend that Stewart did not imply that such complaints were true, but criticized Poret for failing to account for the potential influence of such information (true or not) on survey respondents.  Defendants assert that Stewart conducted his own research online, assumed that a highly involved purchaser of a mattress would also seek out such information before purchasing a mattress, and considered evidence that suggests customers do online research before making such purchases.

The Court is not convinced that Stewart has made or intends to make any statements regarding the truth of the Internet reports.  Instead, it is presumptively permissible for Stewart to analyze the availability of online information to consumers and to discuss its potential impact on survey respondents.  Should Stewart attempt to testify as to the actual truth of the online complaints at trial, Plaintiff is free to object.  The Court concludes that Plaintiff's remaining arguments go to the weight of Stewart's opinions, not their admissibility.  Therefore, they can be challenged on cross-examination.

49

## VI.   Technical Experts

### A.   Brian Fogg

Defendants retained Brian Fogg ("Fogg") as a polyurethanes expert witness. (Patton Decl. ¶ 17, Ex. 16 ("Fogg Report").)  Fogg has more than fifty years of experience in the polyurethane industry, including more than ten years consulting for polyurethane manufacturers, suppliers, and consumers.  (*Id*. at 2-4.)  Defendants engaged Fogg "to provide an expert opinion with regard to comparative claims challenged by Plaintiff Select Comfort to be false or misleading, namely, that Select Comfort's Sleep Number M-Series beds contain 'Commodity Memory Foam,' while Tempur Sealy's Tempur Choice beds contain 'Proprietary TEMPUR® Materials."  (*Id*. at 4.)

In his report, and relevant to the present motion, Fogg concludes:

> Based upon my knowledge and experience in the polyurethanes industry and specifically the flexible foam slabstock manufacturing segment, and the materials I have reviewed in this litigation, it is my expert opinion that the challenged statement describing the Sleep Number M Series beds as containing "commodity memory foam" is a true and accurate factual statement, and is neither false nor misleading.

(*Id*. at 15.)  Fogg further states that Tempur-Pedic's foam is "viewed by the industry as the highest standard, highest quality" and that "[o]ther mattress manufacturers must obtain their memory foam from commercial foam producers that offer such products as commodity material."  (*Id*. at 6.)  Fogg also explains that purchasers of "commodity foam, such as Select Comfort, do not have control over the production equipment or the chemical formulation."  (*Id*. at 12.)  Fogg concludes, based on his review of the technical specification for foam products Plaintiff purchased, that nothing indicates that those

products are of a specialty nature and that Plaintiff provides the same specifications to

numerous suppliers when it is acquiring foam.  (*Id.* at 13.)  Since each supplier is able to

meet Plaintiff's specifications, Fogg concludes that this type of acquisition is "the

essence of the definition of a commodity supply situation" – thereby making the

"commodity" claim truthful.  (*Id.* at 13, 15.)

Plaintiff seeks to exclude Fogg's report and opinions because:  (1) Fogg cannot

opine on the proper definition of "commodity" and relies on an irrelevant and

inapplicable definition; and (2) Fogg cannot opine as to whether advertising is false or

misleading.  Moreover, Plaintiff argues that Fogg's report is not in rebuttal to any of

Plaintiff's experts and is, therefore, improper.

First, Plaintiff takes issue with Fogg's opinion that the term "commodity" has a

commercial definition found at the website Investopedia:

> A basic good used in commerce that is interchangeable with other
> commodities of the same type.  Commodities are most often used as inputs
> in the production of other goods or services.  The quality of a given
> commodity may differ slightly, but it is essentially uniform across
> producers.  When they are traded on an exchange, commodities must also
> meet specified minimum standards, also known as a basic grade.

(Fogg Report at 9.)  Plaintiff maintains that Fogg is not qualified to render an opinion to

the jury on definition of "commodity."  The Court agrees.  In a false advertising case,

such as this one, a plaintiff must prove the falsity of the challenged advertisement by

establishing either literal falsity or implied falsity.  *3M Innovative Props. Co.*,

361 F. Supp. 2d at 969.  When determining whether a statement is literally false, the

statement must be analyzed in the full context of the advertisement.  *See id.* at 969-70;

*see also Rhone-Poulenc Rorer Pharm.*, *Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 516 (8th Cir. 1996).  Here, there is no evidence that Defendants consulted any expert to determine the meaning of "commodity" before creating their advertisement, and it appears that Fogg's testimony on this point is being offered as an after-the-fact explanation for a marketing decision.  Fogg is a polyurethane expert, not a marketing expert, and he has no particular qualification that would allow him to opine on how a consumer would perceive the meaning of the advertisement.  *See, e.g.*, *LG Elecs. USA, Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 957 (N.D. Ill. Sept. 28, 2009).  Further, there is no indication that Fogg considered consumers' perception of the statement about "commodity" foam or what exactly Tempur-Pedic understood the meaning to be when the advertisement was created.  For all of the above reasons, the Court concludes that Fogg's report, insofar as it offers an opinion on the meaning of "commodity" as used in the Flyer, is properly excluded.  Because Fogg is not permitted to offer an opinion as to the definition of "commodity" in the Flyer, he is also precluded from offering any opinion as to whether or not the statement describing the Sleep Number M-Series beds as containing "commodity memory foam" is true or false.[15]

### B.    Bernard Kuchel

Bernard Kuchel ("Kuchel") is an expert witness for Defendants.  (Patton Aff. ¶ 22, Ex. 21 (Kuchel Report).)  Plaintiff seeks to exclude portions of his report and opinions and, in particular, testimony that merely summarizes the testing and opinions of other

---

[15]    The Court need not reach the issue of whether the contested opinions are proper rebuttal to Poret's report.

experts, testimony that certain graphics are not misleading, and portions of Kuchel's

report that consist of non-rebuttal opinions.

Kuchel is a mechanical engineer with almost thirty years of professional

experience, who for the last twenty years has focused on the mattress and bedding

industry.  (*Id.* at 2.)  Defendants retained Kuchel to:  (1) provide an opinion concerning

Test Report 2015-DRE-101QT;[16] (2) rebut Plaintiff's claims that graphical depictions

and associated text appearing in the Flyer are false or misleading; and (3) analyze the

testing completed by Element Materials[17] on the "hammocking effect" of a Tempur-

Choice and Sleep Number M-series beds, as well as the statement that the Tempur-

Choice "Virtually Eliminates Hammocking."  (*Id.* at 2.).

In summary, Kuchel intends to testify on the topic of "hammocking," such as how

the term is commonly used in the industry, the physics behind mattress deformation, what

Select Comfort tests reveal about mattress deformation, and finally that the

Tempur-Choice bed is effective at eliminating or reducing "hammocking."  (*Id.* at 3-7.)

Kuchel also intends to testify that the graphics and text in the Flyer, as they relate to

---

[16]     Design Research Engineering ("DRE") is an independent engineering company, hired by Select Comfort to provide quantitative comparisons of the Select Comfort M7 product and the Tempur-Choice product relative to body posture and deformation of the bed surface.  (Kuchel Report at 15.)

[17]     Element Materials Technology ("Element") is an independent testing facility used by mattress manufacturers for product testing.  Kuchel, who led the R&D departments at Simmons and Sealy for several years, worked closely with Element (at the time Stork Materials Technology) to design the comparative analysis of the Tempur-Choice and M-Series mattresses.  (*Id.* at 2; App'x  3.)  Plaintiff retained Element to provide quantitative comparisons of the Select Comfort M7 bed and the Tempur-Choice bed.  (*Id.* at 15.)

"hammocking," are a reasonable comparison of their relative performances and, therefore, are not misleading to a consumer.

Plaintiff objects to Kuchel's expert testimony on substantive and procedural grounds.  First, Plaintiff argues that because Defendants designated Kuchel as a rebuttal expert, his testimony should be limited to rebuttals of the affirmative testimony of Plaintiff's experts.  Plaintiff concedes that Kuchel's testimony with regard to the DRE testing is proper rebuttal.  (Kuchel Report at 15-18.)  However, Plaintiff contends that the remainder of Kuchel's report discusses previous testing performed by laboratories that Plaintiff's experts have not addressed (Stork, Custom 8, and Element).

The scheduling order in this case set two deadlines for expert disclosures.  (Doc. No. 155.)  A March 6, 2015 deadline for "affirmative experts" and an April 17, 2015 deadline for "rebuttal experts."  (*Id*.)  The parties negotiated the deadlines and agreed that the affirmative deadline applied to all parties *regardless of burden of proof*.  (Doc. No. 201 ¶ 3, Ex. 2 ("In particular, if we are going to edit the schedule to not contemplate a third-round of expert disclosure, we need to clarify that the first disclosure date applies to affirmative experts to be used by any of the parties.").)  Thus, the rebuttal report deadline was limited to experts who would rebut opinions of experts disclosed on the affirmative deadline.  *See, e.g.*, *3M Innovative Props. Co. v. Barton Nelson, Inc.*, Civ. No. 02-3591, 2004 WL 1774528, at *4-5 (D. Minn. Aug. 8, 2004).

Kuchel was disclosed as an expert witness on April 17, 2015, the rebuttal deadline. The Court has reviewed the content of Kuchel's report and agrees that many of his opinions are affirmative opinions and do not address topics raised in Plaintiff's expert

reports.  For example, Plaintiff has not submitted expert reports analyzing the testing done by Stork, Custom8, Element, or Plaintiff's internal testing.  Therefore, any testimony Kuchel offered on those reports is inadmissible.

Defendants submit that Kuchel's testimony rebuts Poret's opinion that the Flyer's "multiple zones"/"one zone" comparison is false and misleading and, in particular, that the comparison "falsely and misleadingly communicates to a substantial percentage of customers that Sleep Number beds suffer from problems of hammocking/bad back support."  (Poret Report at 32.)  Indeed, Defendants argue that "[i]f Poret is permitted to testify that the comparison is false and misleading, then Kuchel should be permitted to rebut that opinion."  (Doc. No. 320 at 22.)  The Court, however, has already noted that Poret will not testify as to the truth or falsity of the statements at issue.  Considering that Poret will not testify that the comparison regarding "hammocking" is false, Kuchel's testimony is not responsive to any other affirmative expert testimony.  Therefore, it is properly excluded.

Accordingly, the Court will allow Kuchel's rebuttal testimony related to the DRE testing.  All other testimony will be excluded.

## ORDER

Based on the foregoing, **IT IS HEREBY ORDERED** that:

1.      Tempur-Pedic's Motion to Exclude the Expert Testimony of Joseph D. Kenyon (Doc. No. [268]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

   a.      The Court excludes Kenyon's alternative Appendix IX model of disgorgement damages and all related testimony.

b.      All other remaining testimony is presumptively admissible assuming proper foundation is laid and subject to objections at trial.

2.      Mattress Firm's Motion to Exclude Expert Testimony of Joseph D. Kenyon (Doc. No. [312]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a.      The Court excludes Kenyon's testimony on lost profits;

b.      The Court excludes Kenyon's alternative Appendix IX model of disgorgement damages and all related testimony;

c.      All other remaining testimony is presumptively admissible assuming proper foundation is laid and subject to objections at trial.

3.      Mattress Firm's Motion to Exclude Testimony of Hal Poret (Doc. No. [298]) is **DENIED** and Poret's testimony is presumptively admissible assuming proper foundation is laid and subject to objections at trial.

4.      Defendants' Joint Motion to Exclude Expert Testimony of Hal Poret (Doc. No. [281]) is **DENIED** and Poret's testimony is presumptively admissible assuming proper foundation is laid and subject to objections as noted in the order.

5.      Defendants' Joint Motion to Exclude Expert Testimony of Erich Joachimsthaler (Doc. No. [307]) is **DENIED** and Joachimsthaler's testimony is presumptively admissible assuming proper foundation is laid and subject to objections at trial.

6.      Plaintiff's Motion to Exclude the Expert Testimony of Brian Fogg (Doc. No. [276]) is **GRANTED**.

7.      Plaintiff's Motion to Exclude the Expert Testimony of David Stewart (Doc. No. [279]) is **DENIED** and Stewart's testimony is presumptively admissible assuming proper foundation is laid and subject to objections at trial.

8.      Plaintiff's Motion to Exclude Expert Testimony of Jeffery A. Stec (Doc. No. [284]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

      a.      The Court excludes Stec's opinions and testimony on lost profits;

      b.      The Court excludes Stec's opinions and testimony on disgorgement based on sales of non-Tempur-Pedic products; and

      c.      All other remaining testimony is presumptively admissible assuming proper foundation is laid and subject to objections at trial.

9.      Plaintiff's Motion to Exclude Testimony of Kristopher A. Boushie (Doc. No. [289]) is **DENIED** and Boushie's testimony is presumptively admissible assuming proper foundation is laid and subject to objections at trial.

10.     Plaintiff's Motion to Exclude Expert Testimony of Bernhard Kuchel (Doc. No. [292]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

      a.      Kuchel's rebuttal testimony related to the DRE testing is presumptively admissible.

      b.      All other testimony is excluded.

Dated:  September 28, 2016          s/Donovan W. Frank
                                    DONOVAN W. FRANK
                                    United States District Judge